EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Puerto Rico Freight System, Inc., representada por su Presidente, Miguel Padilla<br><br>Recurrido<br><br><br>v.<br><br><br>Corporación para el Desarrollo de las Exportaciones de Puerto Rico, t/c/c Promoexport, representada por su Director Ejecutivo, Antonio Sosa Pascual; John Doe #1 y John Doe #2<br><br>Peticionarios | Certiorari<br><br>2012 TSPR 158<br><br>187 DPR \_\_\_\_ |

Número del Caso: CC-2011-278

Fecha: 22 de octubre de 2012

Tribunal de Apelaciones:

Región Judicial de Bayamón y San Juan

Abogados de la Parte Peticionaria:

Lcdo. Fernando Valderrabano Marina
Lcda. Arlyn González Díaz

Abogados de la Parte Recurrida:

Lcda. Miriam Ramos Grateroles
Lcdo. Eugenio Rivera Ramos

Materia: Obligaciones y contratos - Doctrina de culpa *in contrahendo*

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Puerto Rico Freight System,
Inc., representada por su
Presidente, Miguel Padilla                Certiorari
        Recurrido

            v.

Corporación para el Desarrollo      CC-2011-0278
de las Exportaciones de Puerto
  Rico, t/c/c Promoexport,
 representada por su Director
   Ejecutivo, Antonio Sosa
 Pascual; John Doe #1 y John
           Doe #2
        Peticionarios


Opinión del Tribunal emitida por el Juez Asociado Señor Rivera García


En San Juan, Puerto Rico, a 22 de octubre de 2012.

Este recurso nos brinda la oportunidad de exponer si, conforme al tratamiento que ha tenido la doctrina de *culpa in contrahendo* en nuestro ordenamiento jurídico, procede compensar a una parte por las ganancias que dejó de percibir al no haberse perfeccionado el contrato proyectado.

En este caso, Puerto Rico Freight Systems (PRFS o la recurrida) presentó contra la Compañía de Comercio y Exportación (la peticionaria)[1] una

_____

[1] Antes conocida como la Corporación de Crédito y Desarrollo Comercial Agrícola de Puerto Rico, entidad subsidiaria del Banco de Desarrollo y que luego se convirtió en la Corporación Pública para el Desarrollo de las Exportaciones, también conocida como Promo Export. Posteriormente, esta cambió su nombre a Corporación para el Desarrollo de las Exportaciones, adscrita al Departamento de Desarrollo Económico y Comercio de Puerto Rico, actualmente conocida como Compañía de Comercio y Exportación. Véase Determinación de hechos número 2 de la Sentencia apelada. Petición de *certiorari*, pág. 821.

demanda sobre daños y perjuicios en la que le reclamó unas indemnizaciones al amparo de dicha doctrina. El Tribunal de Primera Instancia (TPI) la declaró *ha lugar* y concedió a favor de la recurrida, entre otras, una compensación por concepto de lucro cesante. El Tribunal de Apelaciones confirmó esa determinación e, inconforme con ello, la peticionaria compareció ante nosotros mediante el recurso de *certiorari* de epígrafe.

Atendido el recurso, ordenamos a la recurrida que mostrara causa por la cual no debíamos expedir el auto solicitado y modificar esa sentencia, específicamente, la parte que avaló la compensación por las ganancias dejadas de percibir. Estudiado el asunto, determinamos expedir para revisar la procedencia de esa partida.

I

PRFS es una corporación que realiza exportaciones marítimas desde Puerto Rico hacia el Caribe. Su relación con la peticionaria se remonta a un contrato de arrendamiento que suscribieron en el 1993. Mediante este contrato, PRFS arrendó un edificio -identificado como el número 11- perteneciente a la Compañía de Comercio y Exportación. Más adelante, para el 1997, PRFS le comunicó al administrador de las facilidades comerciales de su arrendadora que vislumbraba expandir su negocio, razón por la que interesaba arrendar otro edificio. Así entonces, la peticionaria le comunicó a PRFS que próximamente estaría construyendo el "edificio 15" dentro de una zona

identificada como la "zona libre".[2]  Esto llamó la atención del presidente de PRFS, el Sr. Miguel Padilla, habida cuenta que interesaba convertirse en operador de esa zona.

Ahora bien, debido a ciertas desavenencias que surgieron durante la vigencia de ese contrato de arrendamiento, PRFS instó una acción judicial sobre *injuction* preliminar, cumplimiento específico de contrato y daños, contra la peticionaria.  A raíz de ese pleito, las partes suscribieron en diciembre de 1999 una moción de desistimiento por estipulación, mediante la cual PRFS desistiría del caso sin perjuicio.  El objeto principal de tal transacción fue el futuro arrendamiento del "edificio 15".  En su parte pertinente, la estipulación dispuso:

> B) Las partes acuerdan que la parte co-demandada, ahora Corporación para el Desarrollo de las Exportaciones le arrendará al demandante el edificio número 15 del Centro Mercantil Internacional, el cual al presente se encuentra en construcción, siempre y cuando las partes lleguen a un acuerdo en los asuntos que están negociando actualmente.
>
> C) Con relación al Contrato del Edificio 15 el señor Padilla solicita que:
>
> 1. Que el contrato sea de 10 años renovable a 10 años más.
>
> 2. El canon de arrendamiento no será mayor de cinco dólares con cincuenta centavos ($5.50) anual el pie cuadrado, por el término del contrato.
>
> 3. La Corporación será responsable de todas las mejoras, diseños y construcciones estructurales y el señor Padilla será

---

[2] La "zona libre de comercio" opera bajo una ley federal que provee incentivos para compañías de manufactura y movimiento de carga a través de controles de la aduana federal.  Id., pág. 824.

responsable de todas las mejoras interiores y de oficina.

4. Las mejoras que realice el señor Padilla en el Edificio 15 serán aprobadas previamente por la Corporación. Dicha aprobación no puede ser irrazonablemente denegada. Al concluir el contrato, la Corporación, a su costo, podrá eliminar estas mejoras.

5. El (sic) eventualidad de que la Corporación resuelva el contrato por falta de pago de canon de arrendamiento, el señor Padilla será responsable por los cánones de arrendamiento mientras las facilidades del Edificio 15 estén deshabitadas. La Corporación será responsable de hacer gestiones de buena fe para conseguir un nuevo arrendatario.

D) El señor Padilla será responsable de convertirse en operador independiente de la Zona Libre. De convertirse en operador independiente de la Zona Libre se revisará el contrato de arrendamiento del Edificio 11 a los efectos de incluir al arrendador dentro de los incentivos y/o ayudas que estuviesen vigentes para los operarios de la Zona Libre.

E) La Corporación para el Desarrollo de las Exportaciones se compromete a presentar ante su Junta de Directores las peticiones del señor Padilla para su estudio y consideración, sin que por ello se entienda que su gestión constituye una aceptación o compromiso de que las peticiones serán aprobadas. Se aclara que específicamente las peticiones 1 y 2 del apartado c constituyen peticiones fuera del ámbito de poderes de otros funcionarios que no sea la Junta de Directores de la Corporación y sólo pueden ser aprobadas expresamente por estos últimos.

F) Una vez las partes hayan llegado a un acuerdo, la Corporación se compromete a tramitar prontamente la redacción y aprobación del contrato de arrendamiento del Edificio 15. Petición de *certiorari,* Apéndice, pág. 2151.

Como vemos, la peticionaria se comprometió a llevar ante su Junta de Directores los requerimientos de PRFS en

cuanto a las cláusulas del contrato de arrendamiento que se proyectaba. Los orígenes del caso de epígrafe se remontan a esa estipulación. Conforme a lo convenido, PRFS invirtió dinero para adecuar el "edificio 15" a sus necesidades operacionales y para adiestrar parte de su personal en cuanto a los trabajos que allí se estarían realizando. Además, hizo presentaciones publicitarias a varias compañías, en y fuera de Puerto Rico para ofrecerles los servicios de exportación. Sin embargo, transcurrieron dos años sin que se llegara a un acuerdo formal con respecto al "edificio 15". Trascendió que la Junta de Directores de la peticionaria aprobó un término y un canon de arrendamiento mayor al que PRFS había solicitado mediante la estipulación. PRFS no aceptó tales condiciones, y consecuentemente, el contrato de arrendamiento no llegó a perfeccionarse.

Así las cosas, la recurrida presentó contra la peticionaria una demanda de interdicto solicitando el cumplimiento específico de la estipulación. Empero, el foro primario la desestimó, ya que entre las partes no llegó a existir un contrato. No obstante, resolvió lo anterior sin perjuicio de las causas que PRFS pudiera presentar por posibles daños y perjuicios.

Ante ese cuadro, PRFS incoó una demanda sobre daños y perjuicios contra la peticionaria. En lo que es pertinente al recurso que atendemos, la recurrida apuntó que tuvo una expectativa razonable de que el contrato de

arrendamiento del "edificio 15" se perfeccionaría conforme a las especificaciones consignadas en la estipulación. Esto, debido a las representaciones y actuaciones de los agentes y representantes de la peticionaria. Agregó que, acorde con esas expectativas, invirtió sobre $200,000 para acondicionar la estructura del edificio a sus necesidades, así como para poder convertirse en operador de la zona libre.[3] También solicitó, entre otras indemnizaciones, una compensación ascendente a $7,872,084 **por los ingresos que dejó de percibir dada la pérdida de clientes prospectivos al no arrendar el edificio 15.**[4]

Celebrado el juicio, el TPI declaró *ha lugar* las reclamaciones antes mencionadas. Determinó, como cuestión de hecho, que durante el periodo de construcción del "edificio 15" no se le notificó al señor Padilla que se perfilaba un cambio radical en cuanto a los términos del contrato de arrendamiento de ese inmueble. Por el contrario, sostuvo que el Director Ejecutivo de la peticionaria le creó la expectativa al señor Padilla de que endosaría las propuestas que se consignaron en la estipulación. De esta forma, el foro primario encontró a la peticionaria responsable conforme a la doctrina de

---

[3] Según surge del expediente, PRFS sería la única arrendadora del "edificio 15", razón por la cual tuvo que atemperar la infraestructura del edificio para que se ajustara a las necesidades de un solo arrendatario.

[4] También se presentaron unas acciones por interferencia torticera de contrato, libelo e incumplimiento de contrato de arrendamiento con respecto al "edificio 11". De estas causas de acción, las primeras dos se declararon *no ha lugar*.

*culpa in contrahendo* y le impuso el pago de $2,879,256.80. Esta cantidad incluye los ingresos que hubiese generado PRFS durante el término contractual dispuesto en la estipulación y los gastos invertidos en las alteraciones estructurales del "edificio 15", así como en el desarrollo y la promoción de la "zona libre".[5] Además, le impuso el pago de $4,000 en honorarios de abogado por temeridad.

Insatisfecha con el dictamen, la peticionaria acudió al Tribunal de Apelaciones arguyendo que no actuó de mala fe durante las negociaciones e imputó error al TPI al conceder dichas partidas indemnizatorias, en especial, la referente al lucro cesante.[6] El foro intermedio confirmó

---

[5] El TPI valoró los daños económicos relacionados con el "edificio 15" en $3,599,071. Determinó que de esa cantidad, la peticionaria debía pagar el 80%, para un total de $2,879,256.80 (a esa partida le añadió $757.38 relacionados con la causa de incumplimiento contractual respecto al "edificio 11"). Esa distribución del daño surge porque en la demanda, PRFS también solicitó daños económicos por cierto dinero que invirtió en la preparación de un manual para operar la "zona libre". Acorde con sus alegaciones, las agencias federales pertinentes no aprobaron el manual debido a la negligencia de la peticionaria. Recordemos que en la estipulación el señor Padilla consignó su interés de convertirse en operador de la "zona libre". Sin embargo, en cuanto a esa reclamación en particular, el TPI entendió que PRFS había incurrido en un 20% de negligencia. Id., págs. 730-731.

[6] En específico, la peticionaria señaló que el TPI erró al:
1. no aplicar la doctrina de impedimento colateral por sentencia y permitirle a la demandante apelada litigar nuevamente el contenido de la estipulación y al fallar de manera distinta a lo resuelto mediante sentencia final y firme en un pleito anterior.

2. apreciar y aquilatar la prueba, negarse a desestimar la demanda bajo la Regla 39.2 (c) de las de Procedimiento Civil y al conceder a la corporación demandante $218,481.00 por concepto de gastos incurridos en la consecución de un contrato de arrendamiento, mediando buena fe por parte de la CCE y una partida millonaria en concepto de lucro cesante y/o "ganancias dejadas de percibir" basado en que la Compañía de Comercio y Exportación incurrió en culpa in *contrahendo*; y

3. conceder intereses pre sentencia y honorarios de abogado sin haber mediado una determinación expresa de temeridad por parte de la Compañía de Comercio y Exportación y a pesar de que esta logró la desestimación de dos de las cuatro causas de acción de

la determinación del TPI en todos sus aspectos, sosteniendo así la compensación adjudicada por lucro cesante. Fundamentó su dictamen en que esa partida estaba sostenida por la prueba y en que el propósito de la doctrina de *culpa in contrahendo* es regresar a las partes a la situación en que se encontraban antes de comenzar los tratos fallidos.

No conteste con tal proceder, comparece ante esta Curia la peticionaria y nos señala que:

1. Erró el Honorable Tribunal de Apelaciones al confirmar la sentencia del Tribunal de Primera Instancia y conceder a la corporación demandante $218,481.00 por concepto de gastos incurridos en la consecución de un contrato de arrendamiento, cuando medió buena fe por parte de la CCE y esta no se retiró de las negociaciones.

2. Erró el Honorable Tribunal de Apelaciones al confirmar la sentencia del Tribunal de Primera Instancia y conceder una suma millonaria para compensar los gastos positivos bajo la doctrina de culpa in contrahendo, suma totalmente improcedente en derecho.

3. Erró el Honorable Tribunal de Apelaciones al confirmar la sentencia del Tribunal de Primera Instancia y conceder intereses pre-sentencia y honorarios de abogado por temeridad.

Por su parte, la recurrida puntualiza que este caso no puede disponerse únicamente de acuerdo con la doctrina de *culpa in contrahendo*. Nos sugiere, entonces, que lo analicemos en virtud de los Arts. 1802, 1803 y 1059 del

---

la demandante – apelada por ausencia de prueba bajo la regla 39.2 (c) de las de Procedimiento Civil. Petición de <u>certiorari</u>, pág. 75.

Código Civil de Puerto Rico, disposiciones que, a su juicio, justifican la indemnización concedida.[7]

Ante el marco fáctico que precede, pasamos a exponer las normas jurídicas que se relacionan con la controversia.

II

A

Sabemos que mediante un contrato una persona se obliga a dar una prestación a otra. Una vez constituido, ese convenio se convierte en la ley entre las partes, cosa que se traduce en el principio de *pacta sunt servanda*, o en otras palabras, en que las partes están comprometidas a cumplir lo pactado. Véase, BPPR v. Sucn. Talavera, 174 D.P.R. 686 (2008). Por ello, contravenir una obligación contractual acarrea el pago de alguna indemnización o quedar sujeto al cumplimiento específico de las cláusulas pactadas. Véanse: Arts. 1230 y 1054 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 3451 y 3018.

Ahora bien, la doctrina reconoce que existen varias etapas que preceden la perfección de un contrato. Así pues, se ha dicho que tiene lugar una etapa preliminar

---

[7] El Art. 1802 del Código Civil de Puerto Rico dispone que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización." 31 L.P.R.A. sec. 5141. Por su parte, el Art. 1803 atiende la responsabilidad de los dueños o directores de un establecimiento por los daños causados por sus dependientes o agentes. 31 L.P.R.A. sec. 5142. El Art. 1059 apunta que "[l]a indemnización de daños y perjuicios comprende no sólo el valor de la pérdida que haya sufrido, sino también el de la ganancia que haya dejado de obtener el acreedor, salvas las disposiciones contenidas en las secciones siguientes". 31 L.P.R.A. sec. 3023.

preparatoria, una de perfección y, finalmente, una ejecutoria.  La primera de estas comprende los tratos o las negociaciones preliminares, es decir, el proceso interno de la formación del contrato; la segunda, es cuando concurren todos los elementos esenciales para la existencia de este y la tercera se refiere a cuando se realiza el cumplimiento de la prestación acordada.[8]  J. M. Lete Del Río y otros, Derecho de obligaciones, Navarra, Ed. Thomson Aranzadi, 2010, Vol. 1, pág. 467.  En este caso, nos corresponde estudiar lo pertinente a la etapa preliminar, y cabe señalar que no han sido pocas las opiniones que esta ha suscitado, siendo así objeto de interesantes debates doctrinarios.  Examinemos, pues, dicha normativa.

Hablando sobre los tratos preliminares, Antonio Román García nos instruye en cuanto a que en el transcurso de estos

> las partes pueden haber coincidido sobre una serie de aspectos y concretar estos acuerdos parciales dándoles incluso forma escrita; son apuntes, minutas, borradores o proyectos que, o bien pueden recoger puntos esenciales del futuro contrato, o derivaciones puramente accidentales, representando, en todo caso, por sí mismos la continuación de la etapa

---

[8] María García Rubio, anotando a G. Faggella, nos expone que durante el periodo de preparación de todo contrato deben distinguirse tres momentos: un primer periodo de elaboración o momento preformativo de la oferta; un segundo periodo de perfeccionamiento o de concreción de la propuesta, y un tercer periodo, que el autor italiano denomina "momento operativo" o de puesta en movimiento de la oferta.  M. García Rubio, La responsabilidad precontractual en el derecho español, Madrid, Ed. Tecnos, 1999, pág. 31. (citando a G. Faggella, Dei periodi precontrattuali e della loro vera esatta construzione scientifica, Studi giuridici in onore de Carlo Fadda, 1906, t. III, págs. 271 y sig.

preparatoria del contrato iniciada con los tratos preliminares que, por otro lado, no provocan generalmente ningún género de naturaleza contractual. (Citas internas omitidas). A. Román García, El precontrato: estudio dogmático y jurisprudencial, Madrid, Ed. Montecorvo, S.A., 1982, págs. 373-374.

Se deduce que durante estas negociaciones que preceden al contrato, no existen los elementos necesarios para que pueda nacer la obligación contractual; es decir, el contrato no está supeditado a la aceptación de una oferta, puesto que esta aún se encuentra en la etapa de gestación.[9] Lo que ocurre en esta fase son conversaciones en las que se discute, se proyecta, se observa y se sugiere, a la par que se perfilan los términos que más adelante servirán para establecer la base del contrato. B. Moreno Quesada, La oferta de contrato: génesis del contrato y responsabilidad antecontractual, Barcelona, Ed. Nereo, 1963, pág. 16. Otros autores han señalado que este período comprende simplemente un intercambio de ideas

---

[9] Como paréntesis, es importante puntualizar que la doctrina y la jurisprudencia diferencian la etapa preparatoria de las figuras jurídicas del precontrato y de la oferta. Por un lado, los actos preparatorios de un contrato no pueden confundirse con un precontrato, ya que no producen una verdadera vinculación de naturaleza contractual. Véase, A. Román García, El precontrato: estudio dogmático y jurisprudencial, Editorial Montecorvo, S.A., 1982, págs. 364, 373-374. Véase, también, J. Santos Briz, La contratación privada, Madrid, Ed. Montecorvo, 1966, pág. 100. El precontrato es considerado como un contrato independiente con su propia identidad y significación. Román García, op cit., pág. 94. Véanse además: Jordan v. Padró, 103 D.P.R. 813 (1975); Rossy v. Tribunal, 80 D.P.R. 729 (1958). Por otra parte, la oferta de contrato no es de modo alguno un acto preparatorio de contrato ya que esta es en sí misma una declaración contractual. E. A. Sánchez Urite, La oferta de contrato, fuerza vinculante, Argentina, Ed. Abeledo-Perrot, 1975, Sec. 11, pág. 33. La oferta debe reunir todos los elementos necesarios para que se pueda perfeccionar el contrato, de manera que la prestación del consentimiento sea suficiente para que este nazca a la vida jurídica. La importancia de dicha diferenciación reside en el tratamiento que recibe la responsabilidad que surge de acuerdo con la manera como las partes actúen durante cada una esas etapas. Se deduce, que no todas reciben un trato unívoco.

destinado a llegar, con el tiempo, a la formulación de la oferta de contrato, pero que no es obligatorio, ni la parte que formule las ideas esta forzada a permanecer en ellas. E. A. Sánchez Urite, La oferta de contrato: fuerza vinculante, Argentina, Ed. Abeledo-Perrot S.A., 1975, Sec. 219, pág. 108. Como bien nos resume Luis Díez-Picazo,

> [e]stas conversaciones, proyectos o minutas no constituyen *per se* ningún acto jurídico en sentido estricto, pues de ellos no se derivan efectos jurídicos de manera inmediata. No puede decirse que entre las partes se cree una relación jurídica originada por la voluntad de iniciar los tratos o las conversaciones. Sin embargo, tampoco puede decirse que los tratos o conversaciones sean en sí mismos irrelevantes.
>
> L. Díez-Picazo y otros, Fundamentos del derecho civil patrimonial, 6ta ed., Pamplona, Ed. Thomson Civitas, 2007, Vol. 1, pág. 311.

Ciertamente, las partes realizan tratos preliminares para perfeccionar un contrato y cabe destacar, que en aquellos que son de gran importancia económica o de cierta complejidad, es frecuente que antes de que se produzca el concurso contractual, tengan lugar tales intercambios de ideas. Véase L. Díez-Picazo, Sistema de derecho civil, 6ta ed. rev., Madrid, Ed. Tecnos, 1989, págs. 68-69.

No obstante, es un principio cardinal en el ordenamiento jurídico puertorriqueño que nadie está obligado a contratar. Colón v. Glamorous Nails, 167 D.P.R. 33, 44 (2006).[10] Véase, también, Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 526 (1982). Es decir, las

---

[10] Citando a J. Puig Brutau, Fundamentos de Derecho Civil, 2da ed., Barcelona, Ed. Bosh, 1978, T. II, Vol. I, pág. 226.

partes no están obligadas a proseguir con las negociaciones hasta perfeccionar el contrato, sino que pueden retirarse de estas acorde a sus mejores intereses. Íd. Esa conclusión es ineludible ya que el hecho de que no se concrete el convenio es, por la misma naturaleza de los tratos preliminares, uno de sus posibles desenlaces. Dicho de otra manera, se intenta un resultado que en ocasiones, puede que no llegue a ocurrir. Moreno Quesada, op. cit. pág. 54. Véase, también; Román García, op. cit. pág. 365. Así pues, entrar en una relación contractual se entiende como un ejercicio de la voluntad propia. Véanse: Arts. 1206 y 1213 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 3371 y 3391.

B

Conforme hemos discutido, es una prerrogativa de las partes desistir de los tratos precontractuales. No obstante, se ha reiterado que el ejercicio de un derecho no está exento de responsabilidad si se ejercita de forma abusiva. Tommy Muñiz v. COPAN, supra, pág. 528. Esto significa que existen límites en cuanto a la manera de retraerse de las negociaciones durante los tratos preliminares.[11] Véase Lete Del Río, op cit., pág. 468.

---

[11] Luis Díez-Picazo entiende que

"[l]a posibilidad de retirarse de los tratos o abandonar unas negociaciones no constituye un derecho subjetivo en sentido técnico, del que se pueda abusar por ejercitarlo de forma extralimitada. No es más que un reflejo de la libertad, específicamente de la libertad contractual." L. Díez-Picazo y otros, Fundamentos del derecho civil patrimonial, 6ta ed., Pamplona, Ed. Thomson Civitas, 2007, pág. 319.

Esta Curia se enfrentó a esa situación por primera vez en el caso Prods. Tommy Muñiz v. COPAN, supra. Allí, luego de que las partes estuvieran negociando por un lapso de tiempo sin que se hubiese otorgado un contrato, el Sr. Tommy Muñiz demandó a COPAN para que cumpliera con la adjudicación de una subasta. Ante ello, el foro de instancia resolvió que la parte demandada estaba obligada a resarcir únicamente los perjuicios causados y los gastos en que el demandante hubiese incurrido durante las negociaciones. Al revisar el dictamen, por no existir en nuestro derecho positivo una figura jurídica que atendiera directamente esa controversia, examinamos entonces la doctrina de la *culpa in contrahendo*, expuesta en sus orígenes por el autor alemán R. Von Inhering.[12]

Luego de estudiar el asunto, expusimos que las partes tienen pleno derecho a decidir si se obligarán contractualmente. Sin pasar por alto lo antes mencionado, dictaminamos que durante la fase precontractual es imperativo que estas actúen conforme a la buena fe.[13] Íd., págs. 526-527. Señalamos, en palabras del tratadista

---

[12] Véanse las anotaciones históricas de M. García Rubio, La responsabilidad precontractual en el Derecho español, Madrid, Ed. Tecnos, 1996, pág. 27.

[13] Como nos ilustra María García Rubio, esta buena fe precontractual depende en parte de la naturaleza de la relación jurídica y la finalidad perseguida por las partes a través de ella. García Rubio, op. cit., pág. 43. Nos dice esta autora que entre los deberes típicos de la fase precontractual se encuentra el deber de información, y de lealtad y de protección. Id. Añade, que no es menester asegurar que la totalidad de los deberes mencionados aparezcan de manera conjunta en todos los supuestos de *culpa in contrahendo,* sino que cada uno de ellos suele ser característico de una determinada hipótesis de responsabilidad precontractual, aunque a veces esta responsabilidad puede configurar la violación de varios deberes. Id.

español Díez-Picazo, que dicho deber "no impera solamente en las relaciones jurídicas ya establecidas o constituidas, sino también en las relaciones derivadas de un simple contacto social." Prods. Tommy Muñiz v. COPAN, supra, pág. 527.[14]

Si bien en el caso precitado aplicamos la doctrina de la *culpa in contrahendo* cuando una parte obra contrario a la buena fe, y negligentemente, causa un daño a otro, no pasó desapercibida la dificultad de definir la categoría jurídica de esta doctrina. En ese sentido, dijimos que:

> …la amplia gama de supuestos sobre los cuales puede asentarse la responsabilidad precontractual hace necesario que en el análisis del problema se considere qué figura jurídica -culpa, dolo, fraude, buena fe, abuso del derecho u otros principios generales del derecho- responde más adecuadamente como fundamento jurídico para la solución del caso. Esto ya que las negociaciones que anteceden al contrato pueden ser de variada índole, y por tanto, la responsabilidad precontractual puede surgir en diferentes supuestos. Prods. Tommy Muñiz v. COPAN, supra, págs. 529-530.

Como vemos, a partir de Prods. Tommy Muñiz v. COPAN, supra, no cabe duda que la referida doctrina tiene cabida en el ordenamiento jurídico puertorriqueño; no actuar en concordancia con lo que exige la buena fe requerida en el periodo precontractual apareja incurrir en la

---

[14] Ya desde principios del siglo pasado G. Faggella había estimado que desde este primer periodo preparatorio era posible la responsabilidad precontractual. Según su criterio, en ese lapso de tiempo existe entre las partes una autorización tácita a tratar que, a pesar de que no puede considerarse un contrato en sí, genera la confianza de que se perseverará hasta un acuerdo final o hasta que se derive que el convenio no es posible. Esto significa que la ruptura de los tratos preliminares, en caso de retirada intempestiva, genera la obligación de resarcimiento por los gastos efectuados por la otra parte. Rubio García, op. cit., pág. 32.

responsabilidad que se deriva de la llamada *culpa in contrahendo*. Empero, en aquella ocasión no abordamos la normativa que concierne a la compensación que debe otorgarse en una causa de esa naturaleza. En cuanto a esa materia, gran parte del debate doctrinario gira en torno a la catalogación que se le confiere a la *culpa in contrahendo*, es decir, el carácter contractual, extracontractual o *sui generis* de la doctrina. Mientras, otros autores restan importancia a tal clasificación. Entienden que la médula del asunto radica en la indemnización que haya de otorgarse.[15]

Por nuestra parte, en <u>Torres v. García</u>, 119 D.P.R. 698, 703 (1987), resolvimos una controversia al amparo de la doctrina de *culpa in contrahendo*, y acogiendo la tesis de B. Moreno Quesada[16], mencionamos que esa responsabilidad se encontraba inmersa en el Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141, dado a que en ese artículo se recogen, entre otros, los casos de perjuicios causados por el ejercicio abusivo de los derechos. Años después, en <u>Colón v. Glamorous Nails</u>, supra, enunciamos que el deber de actuar conforme a la buena fe durante los tratos preliminares no se refiere a la obligación de

---

[15] José Manuel Lete Del Río señala que lo más acertado es la atención al caso concreto y la huida de calificaciones apriorísticas (contractuales o extracontractuales) que, según dice, no sirven para resolver los problemas prácticos planteados por las negociaciones frustradas o el contrato viciado. J.M. Lette Del Río, <u>Derecho de obligaciones</u>, Navarra, Ed. Thomson Aranzadi, 2010, Vol. 1, págs. 490-491.

[16] B. Moreno Quesada, <u>La oferta del contrato</u>, Barcelona, Colección Nereo, 1963, pág. 46.

diligencia genérica y *erga omnes* impuesta por el Art.

1802, <u>supra</u>.    Más bien, proferimos que la *culpa in*

*contrahendo*

> [e]s una obligación hacia una persona determinada,
> que surge en aquel momento en el curso de las
> negociaciones en el cual el ejercicio del derecho
> de una parte a retirarse, corolario del principio
> de la autonomía de la voluntad, activa la
> protección de la confianza depositada por la otra
> y resulta contrario al principio inmanente de la
> buena fe.  La realidad es que, al igual que otros
> supuestos de responsabilidad que nacen por
> aplicación de los principios derivados de la buena
> fe, la *culpa in contrahendo* carece de regulación
> propia.  Por eso, aunque la hemos ubicado, por
> analogía, bajo la égida del Art. 1802 de Código
> Civil, <u>supra</u>, estamos obligados a continuar
> colmando, caso a caso, los vacíos normativos
> subsistentes, en aquellos aspectos que no son del
> todo compatibles con los elementos típicos de la
> responsabilidad extracontractual.  (Citas
> omitidas). <u>Colón v. Glamorous Nails</u>, supra, pág.
> 55.

Parte del asunto referente a la indemnización que

debe concederse lo intimamos en ese mismo caso, al

dilucidar si procedía conceder a la demandante una

compensación por los daños emocionales según esa causa.

Esgrimimos, citando a Asúa González y a Ghersi, que

> [l]a indemnización por culpa in contrahendo
> es pues, reparativa, basada en el principio
> de que quien vulnera la confianza depositada
> por otro, debe devolver a esa persona al
> estado en que estaría si no se hubiesen dado
> las circunstancias que dan lugar a la
> reparación.  Se cuida mucho la doctrina de
> permitir que a través de la indemnización la
> parte agraviada obtenga las ventajas
> económicas que hubiera representado llevar a
> feliz término el proceso de negociación
> (interés positivo).  En vez, el objetivo es
> "colocar al perjudicado como si no hubiese
> emprendido los contactos negociales." (Citas
> omitidas) <u>Colón v. Glamorous Nails</u>, supra
> pág. 57.

De esta manera, dictaminamos que el deber de indemnizar por el rompimiento culposo de los tratos preliminares, alcanza de ordinario, tan solo el llamado "interés negativo", es decir, la reparación de los gastos sufridos y las pérdidas patrimoniales[17] derivadas del proceder arbitrario de la parte culpable.[18] Id., pág. 58. Conforme a ese análisis, rechazamos el argumento de que procedían compensaciones morales en tales casos.

Los fundamentos que delimitan la indemnización que se debe conceder en casos de *culpa in contrahendo* son: (1) que la responsabilidad de actuar conforme a la buena fe surge como "hija de la equidad", para sancionar el quebrantamiento de la confianza, y ,(2) de fuerte política

---

[17] En cuanto a los gastos incurridos en las negociaciones, Moreno Quesada opina que:

> "Resulta de suma importancia la determinación en cada caso de si efectivamente los gastos, estudios, y en general, las actividades que constituyen el contenido propio de las negociaciones previas, están justificados por la aprobación de la otra parte, que ha podido intervenir directamente tomando la iniciativa al encargar su realización, o bien de un modo menos directo, asintiendo a los que va a realizar la otra parte. Y decimos que es de interés fijar con claridad este extremo, porque precisamente uno de los presupuestos de la exigencia de responsabilidad preliminar, es que los incursos en ella hubiesen alentado el comienzo o la continuación de los gastos que van a hacerla nacer, creando en las personas que los realizan un estado de ánimo de confianza en la trascendencia de las negociaciones y la fundada esperanza de que por su transcurso obtendrá unos resultados con los que compensar los desembolsos o actividades que realice, o que si el éxito no las corona se deberá a la imposibilidad de llegar a unos acuerdos dada la incompatibilidad de las posturas de las partes negociadoras." Moreno Quesada, op. cit., pág. 47.

[18] Cabe destacar que como contraparte al interés negativo, existe también el interés positivo, que es el llamado interés de cumplimiento o interés de la ejecución de un contrato. El interés negativo está determinado por la falta de validez o por la frustración del contrato, también llamado interés de confianza. Díez-Picazo, Fundamentos de derecho civil patrimonial, op. cit, pág. 325.

pública que existe a favor del tráfico jurídico y la libertad de contratación. En cuanto a esto último, fuimos enfáticos en establecer la necesidad de sujetar el alcance de esa responsabilidad a consideraciones de política pública que usualmente no están presentes en la determinación de responsabilidad extracontractual. Es por eso que reiteramos que la doctrina de la *culpa in contrahendo* debe aplicarse solo restrictivamente. Colón v. Glamorous Nails, supra, pág. 47. Torres v. García, supra, pág. 710. Nos señala Luis Díez-Picazo, anotando a De Lupis, que "si se estableciera un régimen general de responsabilidad, se impondría a las partes tal cautela y circunspección que se obstaculizaría energéticamente la vida del tráfico." Díez-Picazo, Sistema de derecho civil, op. cit., págs. 68-69.

Si bien expusimos las instancias en que hemos aplicado la doctrina de *culpa in contrahendo,* la anterior reseña no dispone de la controversia que nos ocupa. Como ya adelantamos, debemos justipreciar si en el ordenamiento jurídico puertorriqueño procede compensar el lucro cesante de acuerdo con los fundamentos de la doctrina en discusión. La peticionaria arguye la negativa, por cuanto en Colón v. Glamorous Nails, supra, resolvimos que la compensación incluiría únicamente el llamado "interés negativo". Nos corresponde, pues, delimitar el alcance de dicho interés. De entrada, destacamos que la doctrina se encuentra dividida respecto a ese particular. Por un

lado, algunos juristas opinan que las ganancias dejadas de percibir, deben comprenderse dentro del llamado interés negativo, mientras otros opinan lo contrario. Procedamos a escrutar este asunto, definiendo primeramente el concepto lucro cesante y, luego, elucidando si ese tipo de compensación es cónsona con la doctrina en discusión.

C

El Art. 1059 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3023, que trata sobre la naturaleza y el contenido de las obligaciones, regula el deber de resarcir a una persona por las ganancias que dejó de percibir. Esta disposición preceptúa que "[l]a indemnización de daños y perjuicios comprende no solo el valor de la pérdida que haya sufrido, sino también el de la ganancia que haya dejado de obtener el acreedor …". Por su ubicación en el Código, este tipo de reparación es exigible en caso de incumplimientos contractuales o extracontractuales. Véase A. Borrell Macia, Responsabilidades derivadas de culpa extracontractual civil, Estudio del artículo 1902 del Código Civil y breves comentarios sobre los artículos 1903 y 1910 del propio Cuerpo legal, Barcelona, Ed. Bosh, 1958, Sec. 38, págs. 81-83.

En nuestra jurisprudencia, hemos descrito a la compensación por lucro cesante como aquella partida de daño que debe resarcirse por razón de la pérdida de ingresos infligida al perjudicado y la correspondiente

disminución de su capacidad productiva. <u>S.L.G. Rodríguez v. Nationwide</u>, 156 D.P.R. 614, 623-624 (2002). Más específicamente, es una ganancia futura frustrada que con cierta probabilidad era de esperarse según el curso natural de los acontecimientos. Id.[19] Y en relación con el presente caso, conviene anotar los apuntes del tratadista Manuel Albaladejo, en cuanto a que también constituye lucro cesante, los contratos frustrados que se hayan hecho con terceros o que se pudieran haber realizado de no haber mediado el incumplimiento del deudor. M. Albaladejo y otros, <u>Comentarios al Código Civil y compilaciones forales</u>, Madrid, Ed. Rev. Der. Privado, (1989), T. XV, V. 1, pág. 687.

Ahora bien, existen ocasiones en las cuales será improcedente esta partida. Una de estas es cuando la misma resulta especulativa o no se puede demostrar su correlación con el acto dañoso. <u>S.L.G. Rodríguez v. Nationwide</u>, supra. Por otro lado, en ocasión de referirse a las situaciones en que ha mediado un incumplimiento contractual, Albaladejo nos indica que

> [t]ambién esta justificado el rechazo cuando el acreedor ha solicitado por vía resolutoria la indemnización de los gastos de confianza contractual (interés negativo) y, cumulativamente, a la ganancia frustrada por incumplimiento. Albaladejo, <u>op cit</u>., pág. 686.

---

[19] Téngase presente que para poder obtener esta compensación, es necesario que el reclamante establezca que las actuaciones del demandado ocasionaron la interrupción y el cese de sus ingresos. <u>S.L.G. Rodríguez v. Nationwide</u>, 156 D.P.R. 614, 624 (2002).

Relacionado con lo anterior, y discutiendo el Art. 1.124 del Código Civil de España -análogo al Art. 1077 de nuestra legislación civil,[20] que regula el derecho a resolver las obligaciones recíprocas- Díez-Picazo nos ilustra que el lucro cesante no debe proceder cuando una parte solicita que se resuelva un contrato. Razona que la propia definición de "lucro cesante" implica que el acreedor se quiere colocar en la misma situación patrimonial que si el contrato hubiese llegado a buen término, cosa que no guarda armonía con la resolución. Díez-Picazo, Sistema de derecho civil, op. cit., pág. 271. Una vez definido el lucro cesante y algunas de las instancias en que este no procede, pasemos a determinar si el "interés negativo" engloba su recobro. Para ello, debemos repasar los orígenes de ese interés, cometido en el que nos ayudan los apuntes de la profesora María García Rubio. Veamos.

Nos recuerda esta autora que R. Von Inhering, al exponer su tesis en cuanto a la *culpa in contrahendo*, se enfocó en el hecho de que si una parte ocasionaba la nulidad de un contrato, por haber incurrido en esa culpa, respondía frente a la otra por el daño causado debido a la anulación. García Rubio, op cit., pág. 27. Nos continúa

---

[20] El art. 1077 dispone en parte que "[l]a facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe. El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible." 31 L.P.R.A. sec. 3052.

relatando que el "culpable" no habría de responder con el equivalente de la prestación prometida ya que de un contrato nulo no podría surgir la obligación de cumplir. Anota que, según los postulados del tratadista alemán, el "culpable"

> … estar[ía] obligado a poner a la otra parte en la misma situación patrimonial en que se encontraría si no hubiese estipulado el negocio; esto último sería el interés negativo, o interés en la no conclusión del contrato por oposición a aquello, que sería el interés positivo o interés en el mantenimiento o ejecución de la obligación, existiendo correspondencia entre lo primero y la invalidez del negocio, y lo segundo y su validez. El interés negativo, que en determinadas ocasiones podría alcanzar el montante del interés positivo, vendría conformado tanto por pérdidas efectivas, como por falta de ganancias; entre las primeras estarían los gastos realizados en preparación y ejecución del contrato nulo (v. gr., gastos de embalaje, expedición, etc.); entre las segundas habría de computarse, sobre todo, la pérdida de otras ocasiones favorables de contratar. Id., pág. 28.

Para el tratadista alemán Von Ihering, dentro de la falta de ganancias debían computarse los daños derivados por el rechazo de otras ocasiones en que se hubiese podido concluir el contrato, así como el hecho de haber dejado de buscar en tiempo útil esas posibles oportunidades. Id., pág. 231.

Es de notar que el precursor de la doctrina de la *culpa in contrahendo* estimó que la pérdida de ganancias figuraba como parte del interés negativo. En nuestro tiempo, hay también quienes piensan de manera similar. Algunos autores opinan que se debe calcular como parte integral de dicho interés tanto los gastos inútilmente

realizados o, más propiamente, el daño emergente,[21] así como la frustración de ganancias. García Rubio, op cit., pág. 232. Véase, también, Lete del Río, op. cit., pág. 491.  Para otros, el daño resarcible es todo aquel que se derive de la relación de causalidad. García Rubio, op. cit., págs. 235-236.

Por su parte, Bernardo Moreno Quesada rechaza la idea de resarcir todos los daños derivados de la falta de ejecución del contrato que se esperaba formar.  Concibe, que de ningún modo puede llevarse a ese extremo la cuantía de la indemnización.  Moreno Quesada, op. cit., pág. 56. Continúa exponiendo este autor, que esto será exigible solo cuando se trate de un supuesto de responsabilidad contractual, caso distinto al que tiene lugar durante los tratos preliminares.

Así también, y contrario a lo que opinaba Von Inhering, el jurista italiano G. Fagella rechazó el concepto de interés negativo, según definido por el primero, aún en casos en que existiera una oferta. García Rubio, op cit. pág. 32. Fagella razonó, que el montante resarcible es el valor de la oferta con relación a la formación del contrato y los daños y gastos con los que el destinatario había contribuido a la elaboración de los tratos y de la propia oferta, sin que en estos últimos se

---

[21] Según nos expone María García Rubio, los daños emergentes son los gastos derivados del desarrollo de los tratos truncados, como viajes, asistencia legal e inversiones efectuadas con vista a exigir o recibir la prestación frustrada, tales como obras de acondicionamiento, entre otras.  García Rubio, op. cit., pág. 233.

incluyeran los gastos derivados de la reparación de las ocasiones contractuales perdidas.

Por otra parte, Luis Díez-Picazo interpreta que, aunque la ruptura de las negociaciones no presente una causa justificada, no son resarcibles los gastos que se han llamado "especulativos" o que constituyen un riesgo implícito de todo negocio. Por el contrario, serían resarcibles los gastos que de todas formas habría que realizar para iniciar las negociaciones. Díez-Picazo, Fundamentos de derecho civil patrimonial, op. cit., pág. 324. En cuanto a la inclusión del lucro cesante en el interés negativo, nos dice que

> [l]a doctrina es por lo general pacífica en el sentido de que el daño resarcible en los supuestos de responsabilidad precontractual se limita al interés negativo, que comprende, cuando se dan los supuestos más arriba señalados, el rembolso de los gastos proyectados en contemplación del contrato proyectado. Se ha discutido si el interés negativo comprende también el lucro cesante o las ventajas que la parte perjudicada hubiera podido obtener por haber perdido otro negocio. En la jurisprudencia italiana parece existir alguna línea favorable a la inclusión de este lucro cesante, pero, con mejores argumentos, se ha sostenido a nuestro juicio la solución contraria. En los casos de ruptura de negociaciones, la existencia de una ocasión más provechosa o ventajosa es un motivo justo de retirada, y si la parte no lo aprovechó, solo a ella le es imputable. La situación parece distinta en los casos de responsabilidad precontractual por nulidad de contrato, donde la parte que ha violado los deberes de buena fe, se encuentra obligada al resarcimiento de la pérdida de la ocasión mas ventajosa para quien concluyó el contrato fundado en la confianza de la validez del mismo. Díez-Picazo, op. cit., pág. 325.

Si bien vimos que el Profesor Díez-Picazo se ha inclinado a no incluir las pérdidas de otras oportunidades de contratar, según nos explica M.P. García Rubio "recientemente ha matizado su postura". Estudio Doctrinal: La Responsabilidad precontractual en la propuesta de modernización del derecho de obligaciones y contratos. LXV Boletín del Ministerio de Justicia Núm. 2130 (2011), n. 21. Disponible en www.mjusticia.es/bmj.[22]

III

Luego de exponer el tratamiento jurisprudencial y doctrinal que ha tenido la doctrina de *culpa in contrahendo*, así como la compensación que de ella se deriva, procedamos a resolver la médula del asunto ante nuestra consideración, esto es, si dentro de la indemnización que se ha denominado como "interés negativo" procede incluir una partida correspondiente a la pérdida de ganancias o lucro cesante. En palabras de Bernardo Moreno Quesada, nos corresponde, en nuestra función adjudicadora, "fijar la extensión de los daños indemnizables …". Moreno Quesada, op cit. pág. 58.

En el presente caso PRFS presentó una demanda contra la peticionaria y le requirió el pago de ciertas partidas, entre las cuales incluyó una por lucro cesante. Esos daños, correctamente, fueron atendidos por los foros

---

[22] La autora, citando a L. Díez-Picazo, La existencia del contrato, AAMN, núm. 39., pág. 190 (2009), nos indica que este autor "afirma que aunque se trate de una cuestión discutida y no bien resuelta, ha de entenderse que como consecuencia de la negociación emprendida, hubiera perdido otra ocasión mas ventajosa de contratar".

inferiores bajo la doctrina de *culpa in contrahendo*. Es claro que la estipulación que suscribieron las partes de epígrafe no podía catalogarse como un precontrato, una oferta ni un contrato de arrendamiento, puesto que aludía a que se arrendaría el "edificio 15" "siempre y cuando las partes lleg[aran] a un acuerdo respecto a los asuntos que esta[ban] negociando".[23]

En este punto hacemos referencia a lo que señala una de las Opiniones disidentes. Específicamente, se menciona que el contrato de arrendamiento constituía una condición suspensiva de la estipulación que suscribieron las partes para transar el pleito que tenían ante el TPI. Es claro que esa estipulación es un contrato de transacción. Sobre ello no hay duda ni controversia alguna. En ese contrato de transacción la **negociación** del contrato de arrendamiento del "edificio 15" figuró como parte de las condiciones por las cuales los litigantes desistieron sin perjuicio del caso que se ventilaba ante el TPI. Una de las cláusulas de esa estipulación fue que "la parte co-demandada, ahora Corporación para el Desarrollo de las Exportaciones le arrendar[ía] al demandante el edificio número 15 del Centro Mercantil Internacional (…) **siempre y cuando** las partes lleg[aran] a un acuerdo en los asuntos que esta[ban] negociando ….". (Énfasis suplido) Véase "Moción de desistimiento por estipulación de las partes", Apéndice de la petición de *certiorari*, pág. 2151. La

---

[23] Véase, Moción de desistimiento por estipulación de las partes, Petición de *certiorari,* pág. 2151.

mencionada cláusula contractual se ejecutó cuando las partes comenzaron las negociaciones a los fines de llegar a un acuerdo respecto al arrendamiento de ese inmueble.

Luego de esto, las partes comenzaron a negociar ese contrato de arrendamiento del "edificio 15". El punto neurálgico de la referida Opinión disidente es que no cataloga ese contrato de arrendamiento como un contrato independiente al contrato de transacción. Si bien la negociación del contrato de arrendamiento del "edificio 15" figuró como parte de las cláusulas y condiciones del contrato de transacción, lo cierto es que las partes comenzaron a negociar un contrato de arrendamiento independiente y con vida propia. Es debido a los hechos que ocurrieron durante la negociación de ese contrato de arrendamiento que PRFS acudió al TPI en busca de un remedio. Todo lo anterior denota que las partes se encontraban aún dentro de las negociaciones pertinentes a formalizar un posterior acuerdo contractual, que no existía hasta ese momento.

Tanto el foro de instancia como el apelativo entendieron que las actuaciones de la peticionaria no fueron compatibles con la buena fe durante esos tratos preliminares, habida cuenta que, le creó a PRFS expectativas de que el contrato se perfeccionaría conforme a lo que esa parte solicitó en la estipulación. Razonaron ambos tribunales que en vista de ello, la peticionaria

estaba obligada a resarcir a la recurrida todos los gastos relacionados con esas negociaciones, así como las ganancias que hubiese percibido esta última de haberse perfeccionado el contrato por el tiempo dispuesto en la estipulación, es decir, 10 años. Como mencionamos antes, le ordenamos a PRFS a que mostrara causa por la cual no debíamos revocar parcialmente la sentencia del foro intermedio, específicamente, en cuanto a la partida que concedió por concepto de lucro cesante. Para resolver este cuestionamiento, debemos tener presente que en este tipo de casos, por imperativos de política pública, hay que considerar ciertas limitaciones al determinar la reparación que le corresponderá resarcir al "culpable".

Ya dictaminamos en Colón v. Glamorous Nails, supra, que la responsabilidad dimanante de la *culpa in contrahendo* no es idéntica a la que surge del Art. 1802 del Código Civil, supra. Por eso, allí mencionamos la necesidad de llenar los vacíos normativos que refleje cada caso particular en aquello en que no sea compatible con los elementos típicos de la responsabilidad extracontractual. Una de esas incompatibilidades es que la *culpa in contrahendo* está sujeta a consideraciones de política pública que usualmente se encuentran ausentes en casos dilucidados según ese otro género de responsabilidad. Una de estas consideraciones es no coartar la libertad de contratación ni el tráfico jurídico.

Debido a lo anterior, resolvemos que el lucro cesante no es una partida que deba incluirse dentro del "interés negativo" que se compensa en Puerto Rico a la luz de la doctrina de *culpa in contrahendo*. La recurrida reclamó las ganancias que dejó de percibir por los contratos que hubiera podido otorgar con las compañías a las que le ofreció sus servicios de exportación. Si bien un sector de la doctrina reconoce que pueden figurar como parte de las ganancias perdidas los futuros contratos que no pudieron efectuarse como consecuencia de un acto dañoso, es un hecho indiscutible que la peticionaria tenía la facultad de decidir no arrendarle el "edificio 15" a PRFS. En lo que la peticionaria falló fue en actuar contrario a la buena fe durante las negociaciones, pero de todas maneras, no tenía la obligación de entrar en esa relación jurídica si así no lo entendía conveniente. Creemos que resolver lo contrario iría en detrimento del tráfico jurídico que debemos proteger.

Abona a la conclusión anterior el hecho de que en controversias resueltas al amparo de la doctrina en discusión, no procedería compensar daños que, al evaluarlos más detenidamente, podrían surgir como causa del incumplimiento del contrato en sí. Tal es el caso de la partida que aquí se reclama. La medida de reparación en casos de *culpa in contrahendo* no puede alcanzar lo que significaría el cumplimiento del contrato, ya que durante

los tratos preliminares, las partes tienen la perfecta prerrogativa de no obligarse.

Conceder en estos casos una compensación de esta naturaleza implicaría anticipar un resultado incierto, es decir, la perfección del contrato, revistiendo así al lucro cesante con un manto de especulación, cosa que limita la procedencia del lucro cesante en las acciones donde ya se estima procedente, como es el caso de las acciones incoadas al amparo del Art. 1802 del Código Civil, supra. En este caso no es la dificultad probatoria lo que nos mueve a no otorgarle a PRFS una compensación por los ingresos que hubiese obtenido de haberse perfeccionado el contrato de arrendamiento, cosa que reclamó en su demanda. Lo que sucede es que PRFS iba a obtener esos beneficios económicos una vez se perfeccionara el contrato que tenía previsto con la peticionaria. Y ya hemos visto que los beneficios que se hubiesen obtenido de ese contrato no son partidas a compensarse en una reclamación que se insta bajo la doctrina de *culpa in contrahendo*.

Durante **los tratos preliminares** el hecho de la perfección del contrato es un resultado que puede que no ocurra, independientemente de la forma en que actúen las partes. Claro está, quien se comporte de mala fe estará obligado a reparar al perjudicado por los gastos espontáneos en que incurrió durante la negociación, esto es, aquellos que nada tienen que ver con la fase

ejecutoria del contrato, de manera que ubique a la parte que aspiró contratar y no pudo, en la situación en que se hubiese encontrado de no haber emprendido las negociaciones. En esto, no podemos perder de perspectiva que cuando estamos frente a un caso en el cual las negociaciones no han trascendido la etapa preliminar según la hemos descrito, esa situación es distinta a aquella en que se encuentra una persona que ya recibió una oferta, firmó un precontrato o ya contrató. Estas últimas instancias, por su propia naturaleza, presentan escenarios completamente distintos a los que se suscitan durante los tratos preparatorios. En la etapa precontractual, en la que no existe ningún género de obligación ni se ha emitido una oferta formal, las partes poseen la expectativa de llegar a un acuerdo, no obstante, también conocen que aún ostentan la facultad de retirarse.

Sin abstraernos de que las partes tienen un deber de actuar conforme a la buena fe durante el periodo precontractual, nos hacemos eco de las palabras del ilustre tratadista José María Manresa[24], en cuanto a que no serán resarcibles los daños y perjuicios causados ejercitando un derecho, pues, "el que usa de su derecho a nadie ofende". J.M. Manresa y Navarro, Comentarios al Código Civil Español 6ta. ed. rev., Madrid, Ed. Reus, S.A., 1973, pág. 852. La Opinión disidente del Juez Asociado Estrella Martínez señala que "[n]o es correcto

_____

[24] En sus comentarios al Art. 1.902 del Código Civil Español, análogo al Art. 1802 del nuestro, supra.

expresar que en la etapa precontractual no existe ningún género de responsabilidad." Opinión disidente del Juez Asociado Estrella Martínez, pág. 16. Aclaramos que como bien enunciamos, el hecho de que las partes puedan retirarse de las negociaciones no implica que ello pueda hacerse de manera abusiva y en violación de los postulados que emanan de la doctrina de la buena fe.

Así, pues, resolvemos que en causas de daños y perjuicios que se insten bajo la doctrina de responsabilidad por *culpa in contrahendo,* la medida de resarcimiento no puede comprender las ganancias que se hubiesen generado de haberse perfeccionado el contrato que se negociaba durante los tratos preliminares.

IV

Por entender que la compensación por concepto de lucro cesante es disonante con el derecho de libertad contractual y con los principios de política pública que favorecen el tráfico jurídico, resolvemos que el Tribunal de Apelaciones erró al confirmar al TPI en cuanto a esta partida en particular. Por lo tanto, modificamos la sentencia apelada para eliminar de la partida de daños que debe pagar la peticionaria lo adjudicado por lucro cesante.

Se dicta sentencia de conformidad.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Puerto Rico Freight System, Inc., representada por su Presidente, Miguel Padilla Recurrido | | Certiorari |
| v. | | |
| Corporación para el Desarrollo de las Exportaciones de Puerto Rico, t/c/c Promoexport, representada por su Director Ejecutivo, Antonio Sosa Pascual; John Doe #1 y John Doe #2 Peticionarios | CC-2011-0278 | |

SENTENCIA

En San Juan, Puerto Rico, a 22 de octubre de 2012.

Por los fundamentos antes expuestos, se revoca parcialmente la Sentencia recurrida. Por un lado, se confirma la determinación del foro apelativo intermedio en cuanto resolvió que la Corporación para el Desarrollo de las Exportaciones de Puerto Puerto Rico incurrió en *culpa in contrahendo* durante las negociaciones que mantuvo con Puerto Rico Freight System Inc. (PRFS), conducentes a perfeccionar el contrato de arrendamiento del "edificio 15". Por otro lado, se revoca aquella parte del dictamen que concedió a favor de PRFS una compensación por concepto de lucro cesante. A tenor con los principios que anteceden y ante los hechos del caso de autos, una partida compensatoria de esta naturaleza es improcedente.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió Opinión Disidente a la cual se unió el Juez Presidente señor Hernández Denton. A su vez el Juez Asociado señor Estrella Martínez emitió Opinión Disidente.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Puerto Rico Freight System, Inc., representada por su Presidente, Miguel Padilla<br><br>Recurrida<br><br>v.<br><br>Corporación para el Desarrollo de las Exportaciones de Puerto Rico, t/c/c Promoexport, representada por su Director Ejecutivo, Antonio Sosa Pascual; John Doe #1 y John Doe #2<br><br>Peticionaria | CC-2011-0278 |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se une el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico, a 22 de octubre de 2012

> [Los Códigos de Derecho Civil] están ordenados dentro de un sistema de instituciones de derecho, que no permite aislar una sola disposición de las otras .... Los Códigos se instituyen sobre unas bases fundamentales, una ley de bases, que se les entregan a los cuerpos codificadores como normas generales, para crear un sistema de principios jurídicos, armónicos entre sí, que puedan producir la unidad doctrinal que necesita toda institución de derecho para su validez. Casualmente es esta armonía de los distintos aspectos doctrinales, todas dirigidas hacia un mismo principio jurídico, lo que hace tan deleitosa la tarea del civilista.[25]

---

[25] *Berrocal v. Tribunal de Distrito*, 76 D.P.R. 38, 51 (1954) (Belaval, J., Op. Mayoritaria).

La Opinión que emite hoy este Tribunal en el caso de autos comenta que este Foro tiene ante sí la oportunidad de auscultar si dentro de la doctrina de culpa *in contrahendo* procede compensar a una parte por aquellas ganancias dejadas de percibir al no perfeccionarse el acuerdo previsto. Pese a esbozar una elocuente respuesta a esa interrogante, disentimos por entender que la figura mencionada ni la disposición final del caso son atinadas a la controversia presente. Todo lo contrario, ante el escenario fáctico de este caso el proceder de la Opinión mayoritaria desvirtúa la aplicación restrictiva de la doctrina de culpa *in contrahendo*, lo que altera el estado de Derecho vigente.

El error de la Opinión mayoritaria versa en la aplicación de dicha figura a una controversia en la que entre las partes ya había una relación obligacional y para lo que el Código Civil dispone de un curso a seguir sin tener que recurrir a una figura "hija de la equidad". *Colón v. Glamorous Nails*, 167 D.P.R. 33, 56 (2006). Con este proceder, se resuelve por vía de una figura extraordinaria un asunto para lo que hay unas instituciones de Derecho ya codificadas y las que, imbricadas armónicamente, producen esa unidad doctrinal a la que alude el Juez Asociado Emilio S. Belaval en el epígrafe que colocamos al inicio de esta Opinión en ánimo de ser epígono de dicho pensamiento.

Disentimos, en fin, porque al aplicar una figura jurídica a un caso particular hay que contemplar todos los escenarios que circunscriben a una situación de hechos y hay

que seleccionar aquélla que con mayor precisión se ajuste al caso y que a su vez propenda a un mejor desarrollo del Derecho.

I

Los hechos que rodean esta controversia se pueden resumir de la siguiente manera. Puerto Rico Freight System (PRFS) y la Compañía de Comercio y Exportación de Puerto Rico (CCE)[26] tenían una relación contractual de arrendamiento de una propiedad (Edificio #11) de la CCE. Como parte de un proceso judicial entre éstas, las partes llegaron a un acuerdo transaccional sin perjuicio para ponerle fin a aquel litigio. En diciembre de 1999 se firmó dicho acuerdo titulado *Moción de desistimiento por estipulación de las partes*, en donde acordaron desistir del pleito sujeto a las siguientes condiciones:

> B) Las partes acuerdan que la parte co-demandada, ahora Corporación para el Desarrollo de las Exportaciones le arrendará al demandante el edificio número 15 del Centro Mercantil Internacional, el cual al presente se encuentra en construcción, siempre y cuando las partes lleguen a un acuerdo en los asuntos que están negociando actualmente.
>
> C) Con relación al contrato del Edificio 15 el señor Padilla solicita que:
>
> 1. Que el contrato sea de 10 años renovable a 10 años más.
> 2. El canon de arrendamiento no será mayor de cinco dólares con cincuenta centavos ($5.50) anual el pie cuadrado, por el término del contrato.
> 3. La Corporación será responsable de todas las mejoras, diseños y construcciones

---

[26] Anteriormente tuvo otros nombres, como el del epígrafe, pero nos referiremos a ésta bajo el nombre actual: Compañía de Comercio y Exportación de Puerto Rico (CCE).

estructurales y el señor Padilla será responsable de todas las mejoras interiores y de oficina.

4. Las mejoras que realice el señor Padilla en el Edificio 15 serán aprobadas previamente por la Corporación. Dicha aprobación no puede ser irrazonablemente denegada. Al concluir el contrato, la Corporación, a su costo, podrá eliminar estas mejoras.

5. E[n] [la] eventualidad de que la Corporación resuelva el contrato por falta de pago de canon de arrendamiento, el señor Padilla será responsable por los cánones de arrendamiento mientras las facilidades del Edificio 15 estén deshabilitadas. La Corporación será responsable de hacer gestiones de buena fe para conseguir un nuevo arrendatario.

D) El señor Padilla hará las gestiones para convertirse en operador independiente de la Zona Libre. De convertirse en operador independiente de la Zona Libre, se revisará el contrato de arrendamiento del Edificio 11 a los efectos de incluir al arrendador dentro de los incentivos y/o ayudas que estuviesen vigentes para los operarios de la Zona Libre.

E) La Corporación para el Desarrollo de las Exportaciones se compromete a presentar ante su Junta de Directores las peticiones del señor Padilla para su estudio y consideración, sin que por ello se entienda que su gestión constituye una aceptación o compromiso de que las peticiones serán aprobadas. Se aclara que específicamente las peticiones número 1 y 2 del apartado C) constituyen peticiones fuera del ámbito de poderes de otros funcionarios que no sea la Junta de Directores de la Corporación y sólo pueden ser aprobadas expresamente por [e]stos últimos.

F) Una vez las partes hayan llegado a un acuerdo, la Corporación se compromete a tramitar prontamente la redacción y aprobación del contrato de arrendamiento del Edificio 15.

*Moción de desistimiento por estipulación de las partes*, Apéndice, págs. 2151-2153.

Tras la suscripción del acuerdo de transacción de 1999 pasaron dos años sin que la Junta de Directores de la CCE (la Junta) aprobara el contrato de arrendamiento del Edificio

#15.  En el ínterin PRFS realizó gestiones para adecuar el edificio a sus necesidades comerciales y la gerencia de la CCE siempre se mostró dispuesta a acceder a dichas peticiones.  Entre las gestiones realizadas, cabe destacar la contratación de una firma de arquitectos para que realizara un estudio sobre las modificaciones que requería el Edificio #15 para adaptarlo a las operaciones de PRFS.  Sentencia Tribunal de Primera Instancia, Apéndice, pág. 793.

Es de mencionar que la contratación de dicha firma de arquitectos por parte de PRFS se realizó voluntariamente previo a suscribir el contrato de transacción en diciembre de 1999, puesto que antes de esa fecha PRFS ya había indicado su interés en ese edificio.  *Id.* págs. 792-793; *véase también* Transcripción de la Vista en su Fondo, Apéndice, pág. 1096-1098.  Tras firmar el acuerdo transaccional en cuestión, la firma de arquitectos preparó los planos correspondientes e hicieron unos señalamientos a la CCE sobre los asuntos estructurales que se debían atender en el Edificio #15 para adaptarlo al negocio de PRFS.  Todos los señalamientos u órdenes de cambio fueron acogidos por la parte peticionaria, a lo que ésta invirtió $254,519.96.[27]

Por su parte, PRFS también invirtió dinero en arreglos del interior del edificio y otros asuntos relacionados con el

---

[27] "La parte demandada autorizó órdenes de cambio y las pagó ascendentes a $254,519.96 conforme a los señalamientos que hiciera PRFS a la infraestructura del Edificio #15 para su uso particular. (Exhibit 4 estipulado por las partes)". Sentencia Tribunal de Primera Instancia, Apéndice, pág. 797.

futuro arrendamiento.[28]   A pesar de que el acuerdo de transacción contenía una condición suspensiva para el perfeccionamiento del contrato de arrendamiento, las partes continuaron un intercambio comercial relativo al Edificio #15 a sabiendas de que la Junta no había aprobado nada al respecto y basado en una autoexpectativa especulativa de ambas partes de que se iba a firmar el contrato.[29]

En el año 2000 la gerencia de la CCE realizó un estudio de cánones de alquiler de las instalaciones de la corporación.  Posteriormente, la gerencia de la peticionaria envió a la Junta dos memorandos idénticos con recomendaciones en torno al arrendamiento de PRFS.  En éstos se indicó que a pesar del nuevo esquema de rentas preparado en el año 2000, se recomendaba que a PRFS se le cobrara un canon diferente que sería escalonado y por un término de diez años.

---

[28]El Tribunal de Primera Instancia sentenció que dichos gastos, que incluyen adiestramientos a empleados de PRFS, ascendieron a $218,481.00. *Id.* págs. 814-815.

[29] Por parte de la gerencia de la CCE, su autoexpectativa de aprobarse el contrato de arrendamiento llegó al punto de aceptar las peticiones de cambios estructurales que le hizo PRFS.  Además, el Sr. César Santoni, en representación de la CCE, envió una carta a un futuro cliente de PRFS en donde indicó que PRFS había demostrado profesionalismo y la responsabilidad fiscal necesaria para que la CCE le permitiera a PRFS utilizar las nuevas instalaciones del Edificio #15, con $94,000p^2$ dentro de la Zona Libre. Apéndice, pág. 1009.

Por parte de PRFS, su autoexpectativa especulativa se reflejó mediante el testimonio de Miguel Padilla, presidente de PRFS, quien indicó que era costumbre que se mudaran a las instalaciones de la CCE sin todavía haber perfeccionado un contrato. Transcripción de la Vista en su Fondo, Apéndice, pág. 1139.  Éste también declaró: "El [director ejecutivo de la CCE] me indicó que lo que yo estaba solicitando tenía su aprobación, que él no veía ningún problema; era simplemente esperar la burocracia de sometérselo a la Junta y pasar por todos los procesos normales de Promo-Export". *Id.* pág. 1259.

Finalmente, en la reunión de la Junta del 24 de mayo de 2001, ésta decidió que el arrendamiento sería a un término de cinco años a $6.00p$^2$ por los primeros dos años y $7.00p$^2$ por los próximos tres años.[30] Ante esa contraoferta de la corporación pública, PRFS se mostró en desacuerdo y eventualmente inició el presente pleito judicial.

Los tribunales inferiores sentenciaron que la CCE fue negligente al hacer falsas representaciones a PRFS sobre la firma del contrato de arrendamiento. Concluyeron que, al así proceder, la CCE frustró la expectativa creada en el demandante de perfeccionar el contrato de arrendamiento. El Tribunal de Apelaciones, al confirmar al foro de instancia, sostuvo que por haber ocasionado un daño en la etapa previa al perfeccionamiento del contrato de arrendamiento, se configuró la llamada culpa *in contrahendo*. Es nuestra postura que ello constituye un error en la aplicación del derecho a esta controversia, puesto que ésta ha de resolverse mediante el articulado del Código Civil y no mediante figuras de aplicación restrictiva. Veamos.

## II

### A

Es norma reiterada en nuestro ordenamiento que nadie está obligado a contratar. *Glamorous Nails*, 167 D.P.R. en la

---

[30] De la transcripción de la vista en su fondo se desprende que el contrato de arrendamiento para el Edificio #11 firmado el 22 de diciembre de 1999 tenía vigencia de cinco años a un precio de $6.00p$^2$ por los primeros dos años y $6.50p$^2$ por los siguientes tres años, cifras no muy lejanas a la contraoferta que hizo la Junta en su reunión del 24 de mayo de 2001.

pág. 44 (2006); *Prods. Tommy Muñiz v. C.O.P.A.N.*, 113 D.P.R. 517, 526 (1982). Ahora bien, durante el transcurso de las relaciones precontactuales las partes deben ejercer un comportamiento que se ajuste a los principios de la buena fe. *Glamorous Nails*, 167 D.P.R. en las págs. 44-45; *véase también* José Puig Brutau, *Fundamentos de Derecho Civil* 216, T. II, Vol. I (3ra ed. 1988); María P. García Rubio, *La responsabilidad precontractual en el Derecho español* 43 (1991).

En ánimos de atender las situaciones de daños ocasionados durante la etapa precontractual debido a la terminación injustificada de los tratos preliminares y a la falta del principio de buena fe en esa fase, esta Curia adoptó la figura de culpa *in contrahendo* en *Prods. Tommy Muñiz v. C.O.P.A.N.*, 113 D.P.R. 517 (1982). Para determinar la aplicabilidad de dicha figura y adjudicar responsabilidad que conlleve un resarcimiento, determinamos que es preciso considerar seis elementos: (1) el desarrollo de las negociaciones; (2) cómo comenzaron; (3) el curso que siguieron; (4) la conducta de las partes durante su transcurso; (5) la etapa en que se produjo su rompimiento; y (6) las expectativas razonables de las partes en la conclusión del contrato. *Id.* pág. 530. Asimismo, hemos sido enfáticos en que la aplicación de la doctrina de culpa *in contrahendo* ha de ser **restrictiva** debido a una cuestión de política pública a favor del tráfico jurídico y la libertad

de contratación. *Glamorous Nails*, 167 D.P.R. en la pág. 47, 57-58; *Torres v. Gracia*, 119 D.P.R. 698, 710 (1987).

Como señala la Opinión mayoritaria, la doctrina de culpa *in contrahendo* se utiliza para las fases precontractuales. Por consiguiente, una vez se perfecciona un contrato se aplican las disposiciones pertinentes del Libro IV del Código Civil de Puerto Rico. Aplicar irrestrictamente la figura en cuestión dentro de una relación contractual, no sólo desvirtúa la figura misma, sino que le añade incertidumbre a las relaciones contractuales y al ordenamiento jurídico en sí. La claridad doctrinal le da previsibilidad al Derecho; en contraposición, la falta de claridad doctrinal de la Opinión mayoritaria en la aplicación de la figura de culpa *in contrahendo* abona a la imprevisibilidad de nuestro Estado de Derecho.

La presente controversia no puede verse de manera llana y sencilla, sino que es necesario tener presentes todas las circunstancias que rodean al caso de autos y examinarlas con detenimiento. Tras un riguroso análisis de esas circunstancias, veremos que en este caso es improcedente la aplicación de la doctrina de culpa *in contrahendo*.

**B**

A primera vista, y partiendo de una visión superficial sobre la controversia, parece que entre las partes se quebrantaron las relaciones precontractuales sobre el contrato de arrendamiento. Ahora bien, no debemos soslayar que este caso tiene su origen en un acuerdo transaccional

para poner fin a un pleito anterior. En otras palabras, la presente controversia plantea la situación de que dentro del contexto de una relación contractual se comienza otra relación obligacional. No podemos bifurcar ambas relaciones y enfocarnos en una de ellas en abstracción de la otra, como pretende hacer la Opinión del Tribunal.

Al enfrentarnos a una controversia como la presente, donde se presentan paralelamente e imbricadamente dos relaciones obligacionales, se debe analizar primero aquélla más abarcadora en donde se subsume la segunda relación que se creó por virtud de la primera. De encontrar una solución jurídica a la primera relación obligacional que, a su vez, disponga de la segunda relación, entonces resultaría innecesario incorporar doctrinas de aplicación restrictiva para atender esa segunda relación obligacional.

Según mencionamos, esta controversia surge a raíz de un acuerdo transaccional. Ahí subyace la primera relación obligacional entre las partes y de ésta surge la segunda relación en torno a un futuro contrato de arrendamiento. El Artículo 1709 del Código Civil de Puerto Rico, 31 L.P.R.A. Sec. 4821, establece que las transacciones con motivo de poner fin a un litigio son contratos. Estos contratos de transacción, por consiguiente, están sujetos a las disposiciones del Título I del Libro IV del Código Civil, sobre Obligaciones. Cód. Civ. P.R. Art. 1042, 31 L.P.R.A. Sec. 2992 ("Las obligaciones nacen de la ley, de los contratos ...").

El acuerdo transaccional en cuestión contiene dos cláusulas condicionales a modo de muñeca rusa o *matrioska*; entiéndase, una dentro de la otra. La primera cláusula condicional dispone que la transacción allí convenida está sujeta al perfeccionamiento de un contrato de arrendamiento que tiene por objeto el Edificio #15. La segunda cláusula condicional inmersa dentro de la primera establece que las peticiones de PRFS en torno a los términos del arrendamiento serían presentados ante la Junta de la CCE para su estudio y consideración, sin que ello constituya una aceptación de los términos solicitados.

Las obligaciones condicionales se definen como "aquéllas cuya eficacia depende de la realización o no realización de un hecho futuro y además incierto". José Puig Brutau, *Fundamentos de Derecho Civil* 84, T. I, Vol. II (3ra ed. rev. 1985); *véase además* José R. Vélez Torres, *Derecho de Obligaciones, Curso de Derecho Civil* 136 (Rev. Migdalia Fraticelli Torres, 2da ed. 1997). El propio Código Civil establece que "[e]n las obligaciones condicionales la adquisición de los derechos, así como la resolución o pérdida de los ya adquiridos, dependerá del acontecimiento que constituya la condición". Cód. Civ. P.R. Art. 1067, 31 L.P.R.A. Sec. 3042.

Como se puede observar, el elemento futuro e incierto es lo que caracteriza este tipo de obligación. *Véase también Jarra Corp. v. Axxis Corp.*, 155 D.P.R. 764, 773 (2001). En el caso de autos, el elemento futuro e incierto de la

efectividad del contrato de transacción es que se suscriba un contrato de arrendamiento. En cuanto al perfeccionamiento de dicho contrato, el elemento futuro e incierto es que se presente ante la Junta la oferta presentada por PRFS y la Junta lo apruebe.[31] Éstas, por ser condiciones cuyo efecto, de cumplirse, será la adquisición del derecho a arrendar y la efectividad de la transacción, son de naturaleza suspensiva (*conditio pendet*). Vélez Torres, *Derecho de Obligaciones*, *supra*, pág. 138.

Ahora bien, el Código Civil establece que cuando el cumplimiento de la condición dependa exclusivamente de la voluntad del deudor, la obligación condicional será nula; mientras que si depende de un tercero, será válida. Cód. Civ. P.R. Art. 1068, 31 L.P.R.A. Sec. 3043. En el supuesto de que la condición dependa del deudor, se denomina como una condición potestativa.

Las condiciones potestativas se dividen, según la doctrina, en rigurosamente potestativas y simplemente potestativas. Puig Brutau, *supra*, T. I, Vol. II, págs. 95-96. Sobre este particular nos hemos expresado a los efectos de que "la doctrina delinea una distinción entre las condiciones **rigurosamente potestativas**, las cuales dejan la

---

[31] Cabe señalar que el Artículo 1074 del Código Civil provee una acción al acreedor previo a ocurrir la condición. Dicho Artículo expresa: "El acreedor puede, antes del cumplimiento de las condiciones, ejercitar las acciones procedentes para la conservación de su derecho". 31 L.P.R.A. Sec. 3049. Queda claro que el acreedor en este caso (PRFS) no podía exigir el cumplimiento de la condición, pero sí podía ejercer acciones para conservar su derecho. *Véase Mercedes Bus Line v. Rojas*, 70 D.P.R. 540, 548 (1949).

validez de la obligación al exclusivo arbitrio de una de las partes, y las **simplemente potestativas**, en las cuales el cumplimiento de la condición no está sujeto al total arbitrio de una de las partes". *Jarra v. Axxis*, 155 D.P.R. en la pág. 775 (énfasis suplido).[32] En el referido caso adoptamos la distinción entre rigurosamente y simplemente potestativas, y resolvimos que las condiciones simplemente potestativas no anulan una obligación condicional al amparo del Artículo 1068 del Código Civil. *Id.* pág. 776.

En la controversia de autos nos encontramos con una situación particular y es que el deudor en esta obligación (la CCE) no está sujeto a un acto volitivo único. Esto, debido a su naturaleza de ser persona jurídica cuya administración está a cargo de una Junta de Directores integrada por nueve miembros. Ley de la Compañía de Comercio y Exportación de Puerto Rico, Ley Núm. 323 de 28 de diciembre de 2003, Art. 7, 7 L.P.R.A. Sec. 1227d. Al establecerse en el acuerdo de transacción que el perfeccionamiento del futuro contrato de arrendamiento estaría condicionado a que la Junta lo aprobara, es forzoso concluir que el incumplimiento con dicha condición no depende exclusivamente del arbitrio de un deudor unipersonal, sino que se da el escenario de intervención de un curso determinado exterior o ajeno a la manifestación de voluntad del deudor. Por consiguiente, la obligación condicional presente en el contrato de transacción

---

[32] Vélez Torres define las condiciones simplemente potestativas como aquéllas en que interviene la realización de un hecho exterior a la voluntad de la parte. Vélez Torres, *Derecho de Obligaciones*, *supra*, pág. 146.

del caso de autos es simplemente potestativa y supera la prohibición del Artículo 1068 del Código Civil.

Dicho lo anterior, pasemos a evaluar la disposición del Código Civil concerniente a las cláusulas condicionales potestativas que es aplicable a la situación de hechos ante nosotros y que a su vez nos ilustra sobre el remedio en derecho que este Tribunal debe otorgar, si alguno.

Ante la pregunta de qué ocurre si la condición contraída no se cumple (*conditio deficit*), tenemos a nuestra disposición dos respuestas. Primero, si no hubo culpa, negligencia o dolo de las partes, "entonces ocurre una especie de resolución de la obligación y ésta entonces desaparece". Vélez Torres, *Derecho de Obligaciones*, *supra*, pág. 140; *véase también Jarra v. Axxis*, 155 D.P.R. en la pág. 773. Segundo, si hubo culpa, negligencia o dolo de la parte obligada, debemos acudir al Artículo 1072 del Código Civil, 31 L.P.R.A. Sec. 3047 ("Se tendrá por cumplida la condición cuando el obligado impidiese voluntariamente su cumplimiento").[33]

---

[33] Para llegar a la conclusión de aplicar el Artículo 1072 del Código Civil, es imprescindible hacer una declaración de responsabilidad por dolo, culpa o negligencia por la parte obligada al cumplimiento de la condición. Como norma general, en una controversia contractual hay que evaluar si la parte culpable o negligente debe resarcir los daños ocasionados durante la vigencia de la relación obligacional y para ello se debe considerar lo dispuesto en los Artículos 1054 al 1060 del Código Civil, 31 L.P.R.A. Secs. 3018-3024. Sin embargo, y a modo de excepción, el propio Artículo 1072 del Código Civil ya contempla la penalidad que ha de pagar el deudor que voluntariamente impide el cumplimiento de la condición pactada. La doctrina civilista sostiene que la obligación que impone dicho artículo de dar por cumplida la condición, constituye en sí misma la pena impuesta al deudor

De ocurrir el primer supuesto y desaparecer la obligación, tratándose de un contrato de transacción en el caso de autos, se da por no suscrito dicho acuerdo transaccional y se revive el pleito anterior. Tal escenario ocurrió en *Sol Bravman* et al. *v. Consejo de Titulares del Condominio Palma Real*, 183 D.P.R. 827, 836 (2011) ("La estipulación fue acogida por el Tribunal de Primera Instancia mediante una sentencia .... Sin embargo, posteriormente fue dejada sin efecto debido a que no fue ratificada en la asamblea correspondiente, convocada por el consejo de titulares").

En cuanto al segundo escenario, el motivo detrás del Artículo 1072 lo expresamos en *Jarra v. Axxis* al sostener que "las partes sujetas a una obligación con condición suspensiva tienen que realizar esfuerzos de buena fe suficientes para cumplir sus prestaciones. Si no lo hacen, no pueden invocar la falta de ocurrencia de la condición como defensa para

---

incumplidor en concepto de daños y perjuicios. Sostienen Planiol y Ripert:

> [L]a condición no realizada se *considera cumplida* cuando el deudor, con hechos propios impidió su cumplimiento. Aun cuando los hechos del deudor estén exentos de fraude, causan al acreedor un perjuicio que debe repararse, y la más perfecta reparación que pueda ofrecerse al acreedor es el cumplimiento de la obligación, como si se hubiere realizado la condición.

Marcel Planiol & Georges Ripert, *Tratado Elemental de Derecho Civil* 261-262, T. IV (José M. Cajica trad., 4ta ed. 2003). *Véase además* Puig Brutau, *supra*, T. I, Vol. II, pág. 91.

Por consiguiente, de demostrarse que en la presente controversia la CCE cometió culpa o negligencia que impidiera el cumplimiento de la condición, el remedio jurídico al que tuviese derecho PRFS lo dispone el Artículo 1072 del Código Civil, mas no habría que acudir a la doctrina de culpa *in contrahendo*.

desligarse de su obligación". *Jarra v. Axxis*, 155 D.P.R. en la pág. 777. De ocurrir éste, se daría por cumplida la condición de presentar a la Junta las estipulaciones en torno al arrendamiento y se daría por aprobado lo convenido en el acuerdo transaccional. La consecuencia sería que las partes tendrían que perfeccionar un contrato de arrendamiento que debería contener, como mínimo, las estipulaciones suscritas en la transacción de diciembre de 1999. Examinemos cuál de los dos escenarios se dio en el caso de epígrafe.

**C**

Tal como expusimos previamente, bajo el palio de la relación contractual producto de la transacción surgen dos condiciones suspensivas: (1) que se perfeccione un contrato de arrendamiento y (2) que se presente a la Junta la oferta de PRFS, según recogida en el acuerdo transaccional de diciembre de 1999. Examinemos cada una por separado.

Tras examinar detenidamente los hechos que dieron pie a esta controversia, notamos que la **segunda** condición suspensiva se consumó. Entiéndase, la alta gerencia de la CCE presentó ante la Junta de Directores la oferta presentada por PRFS y la evaluó dentro de sus prerrogativas de aceptarla o rechazarla. Según consta de la minuta de reunión del 24 de mayo de 2001, la Junta rechazó dicha oferta e hizo la correspondiente contraoferta. *Véase* Apéndice, págs. 563-569.

La **primera** condición suspensiva, a la que estaba atada la efectividad del acuerdo transaccional, no se cumplió. A saber, no se perfeccionó el contrato de arrendamiento porque

la Junta válidamente rechazó la oferta de PRFS e hizo la propia, que también fue rechazada por la parte aquí recurrida. Ahora bien, como esbozamos previamente, el no cumplimiento de una condición puede ser mediando dolo, culpa o negligencia de una de las partes, o sin mediar éstos. Del expediente se desprende que aquí no medió culpa o negligencia de parte de la Junta de la CCE, puesto que ésta tenía la libertad de aceptar o rechazar la oferta realizada por PRFS y no hay evidencia de que hubo dolo o fraude al no aceptarla. Concluir lo contrario sería incidir perniciosamente sobre las prerrogativas de una parte contratante en el curso de aceptación de una oferta, lo que afectaría el tráfico jurídico y la libertad de contratación. *Glamorous Nails*, 167 D.P.R. en las págs. 57-58.

Al no mediar dolo, culpa o negligencia por la parte peticionaria para que se cumpliera la condición de perfeccionar un contrato de arrendamiento, pues sencillamente "se extingue y desaparece el vínculo entre las partes". *Jarra v. Axxis*, 155 D.P.R. en la pág. 773. Ocurre lo que Vélez Torres llama "una especie de resolución de la obligación". Vélez Torres, *Derecho de Obligaciones*, *supra*, pág. 140. En tal contexto, se da por no suscrito el acuerdo de transacción y se revive el pleito anterior entre PRFS y la CCE.[34]

---

[34] Reconocemos que revivir un pleito de hace más de diez años podría resultar oneroso tanto para las partes como al proceso judicial. Por ello no descartamos la idea de que ante tal escenario las partes decidan volver a reunirse para lograr una transacción que ponga fin a aquel pleito.

**III**

A base de la discusión anterior es evidente la necesidad de aplicar las disposiciones correspondientes del Código Civil en lugar de la doctrina de culpa *in contrahendo*, máxime cuando esa figura no debe aplicarse a una controversia si los hechos no la justifican. Con esa conclusión resolvemos un aspecto importante del caso de autos, mas dejamos sin atender qué procede con relación a las determinaciones de hechos que hiciera el foro de instancia en cuanto a que ambas partes incurrieron en gastos económicos como parte de la relación comercial.

El Tribunal de Primera Instancia determinó que la CCE incurrió en gastos de infraestructura ascendentes a $254,519.96 para adecuar el Edificio #15 a las necesidades económicas de PRFS. Asimismo, ese foro dio por probado que la recurrida invirtió $218,481.00 entre mejoras internas al Edificio #15 y otros gastos de adiestramiento a su personal, todos relacionados al arrendamiento del edificio en cuestión. Ambas partes invirtieron esas cantidades de dinero previo a que se cumpliera la condición de que la Junta de la CCE aprobara la oferta de arrendamiento que realizó PRFS. La negligencia de ambas es evidente en tanto se desprende del expediente que las partes actuaron con pleno conocimiento de ese dato.

En términos jurídicos, la recurrida realizó mejoras sobre propiedad inmueble ajena, mientras que la CCE permitió y autorizó expresamente las mejores realizadas. Ante tal

escenario, debemos auscultar la aplicabilidad de las disposiciones del Código Civil en cuanto a lo que los tratadistas llaman **accesión continua industrial en bienes inmuebles**. *Véase* Q.M. Scaevola, *Código Civil* 578, T. VI (5ta ed. 1949).

## A

La accesión se define como "el derecho en virtud del cual el propietario de una cosa hace suyo todo lo que ésta produce o se le une o incorpora". José R. Vélez Torres, *Curso de Derecho Civil: los bienes, los derechos reales* 85, T. II (1983). La accesión, como hecho físico, es un cambio, mutación, producción, adquisición, aumento o incremento en una cosa. *Véase* Ángel Carrasco Perera, *"Ius aedificandi" y accesión: la construcción en suelo ajeno en el marco de los principios urbanísticos* 59-60 (1986).

La accesión puede clasificarse en *continua* (por incorporación) o *discreta* (por producción). R. Elfrén Bernier las define de la siguiente manera:

> La *accesión discreta* es la de las cosas que nacen o se producen en las cosa que ya se poseen, es decir, se refiere a los frutos y productos de los bienes. La *accesión continua* se realiza cuando bienes extraños o ajenos a la cosa que se posee se unen o agregan a ésta.

R. Elfrén Bernier, *El derecho de accesión en Puerto Rico* 43 (1970).

La accesión continua puede subdividirse, a su vez, en (1) *mobiliaria o inmobiliaria*, según sea sobre un bien mueble o inmueble, y (2) *natural o industrial*, dependiendo de si la incorporación se debe a fuerza natural o a fuerza humana. *Véase* Vélez Torres, *Curso de Derecho Civil*, *supra*, pág. 88.

La accesión continua se inspira en tres principios: "(a) la buena fe, (b) lo accesorio sigue a lo principal (*accessorium sequitur principale*); y (c) el suelo es siempre cosa principal (*superficies solo cedit*)". *Id.* pág. 92.

El Artículo 287 del Código Civil de Puerto Rico recoge de forma general el derecho de accesión y menciona que es inherente a toda propiedad, ya sea mueble o inmueble. 31 L.P.R.A. Sec. 1131. Ahora bien, en cuanto a la accesión continua inmobiliaria industrial (*aedificatio*), el Código dispone particularmente de los Artículos 294 al 301. 31 L.P.R.A. Secs. 1161-1168. Enfocaremos nuestro análisis en la accesión continua industrial sobre bienes inmuebles por ser la atinente a la controversia de autos.

El Artículo 294 del Código Civil estatuye que "[l]o edificado, plantado o sembrado en predios ajenos y **las mejoras o reparaciones** hechas en ellos, pertenecen al dueño de los mismos, con sujeción a lo que se dispone en los artículos siguientes". 31 L.P.R.A. Sec. 1161 (énfasis suplido). La norma general es que las obras, plantaciones, siembras, mejoras y reparaciones de las que habla el Artículo 294 se presumen hechas por el dueño del predio. Cód. Civ. Art. 295, 31 L.P.R.A. Sec. 1162. No obstante, cuando un tercero es quien realiza las obras, esa presunción se puede controvertir. Ante este último escenario, el Código Civil provee varios cursos a seguir, dependiendo de si el tercero actuó con buena fe o mala fe. Para ello hay que dirigirnos a

los Artículos 297 y 298 del Código Civil.  31 L.P.R.A. Secs. 1164-1165.

Así, y en lo relativo a la controversia de autos, el Art. 297 del Código Civil indica que:

> El dueño del terreno en que se edificare de **buena fe**, tendrá derecho a hacer suya la obra, previo el pago al dueño de la obra del costo de los materiales y la mano de obra, o el costo de reproducción de la misma al momento en que el dueño del terreno ejercitare su derecho, deduciendo la depreciación, lo que resultare mayor, o a obligar al que fabricó a pagar el precio del terreno.

31 L.P.R.A. Sec. 1164 (énfasis suplido).

Lo anterior se basa en el principio de *superficies solo cedit*, derivado del principio *accessorium sequitur principale*, por el que el suelo es lo principal y lo edificado es lo accesorio.  *Laboy Roque v. Pérez*, 181 D.P.R. 718, 727 (2011) (donde se adopta la accesión a la inversa como excepción al principio de *superficies solo cedit* en casos de construcciones extralimitadas); *véase además Collazo Vázquez v. Huertas Infante*, 171 D.P.R. 84, 119-120 (2007) (Fiol Matta, J., Op. Concurrente).

Contrario a la situación anterior, de haber mediado **mala fe** de parte del edificante, "el dueño del terreno puede elegir entre hacer suyo lo edificado, plantado o sembrado, sin obligación de indemnizar, o exigir que su finca sea repuesta al estado en que se hallaba, a costas del autor de la accesión".  José Puig Brutau, *Fundamentos de Derecho Civil* 366, T. III, Vol. 1 (4ta ed. 1994); Cód. Civ. Arts. 298-299, 31 L.P.R.A. Sec. 1165-1166.

De los artículos mencionados se puede observar que a pesar de que el Artículo 294 incluye las mejoras como parte del derécho de accesión, el Artículo 297 no las menciona.  A pesar de ello, los estudiosos del tema y la jurisprudencia de este Tribunal se han expresado a favor de la inclusión de las mejoras como parte de las obras de edificación.[35]  En *Sucesión Echegaray v. Esso Standard Oil Co.* comentamos:

> De acuerdo con las referidas disposiciones de nuestro Código Civil, la accesión no se limita a edificaciones de carácter sustancial y permanente tales como edificios, viviendas, rellenos, muros de contención y canales de riego, sino que se da con respecto de otras obras y mejoras, como las de alumbrado, ascensores y servicio de agua, hornos, depósitos y cobertizo; lavaderos, fuentes y abrevaderos…. Es más, los citados comentaristas aceptan que mejoras útiles 'edificadas' en un inmueble, pero susceptibles de ser retiradas sin deterioro del suelo pueden ser objeto de accesión.

*Sucesión Echegaray v. Esso Standard Oil Co.*, 87 D.P.R. 825, 831 (1963) (citas omitidas); *véase además* Scaevola, *supra*, págs. 578-579 (donde argumenta que las modalidades de accesión que el Código regula (edificación, plantación y siembra) incluyen también las mejoras).[36]

---

[35] Es imperativo que reconozcamos la distinción de mejoras para fines de la accesión, donde el edificante no tiene que ser poseedor, Scaevola, *supra*, págs. 580-581, de las mejoras sin autorización dentro del contexto de un arrendamiento.  En este último supuesto, donde el arrendatario sólo goza de la posesión natural, a las mejoras útiles o de recreo que éste haga les aplican los Artículos 1463 y 416 del Código Civil. 31 L.P.R.A. Secs. 4070 & 1527; *véase además Marchand v. Montes*, 78 D.P.R. 131 (1955) (a un arrendatario que hace mejoras útiles o voluntarias sin consentimiento del arrendador no le aplican las disposiciones sobre accesión. Por lo tanto, sólo tiene disponible el *ius tollendi*: el derecho de llevarse los adornos incorporados, cuando sea posible hacerlo sin dañar la propiedad); *Berrocal v. Tribunal de Distrito*, 76 D.P.R. 38 (1954); Vélez Torres, *Curso de Derecho Civil*, *supra*, pág. 105.

[36] E. Elfrén Bernier también se ha expresado sobre el tema a los efectos de que:

> Para que se produzca la accesión no es necesario que el objeto situado en el inmueble haya adquirido

Para determinar si el curso jurídico a seguir ante una edificación en predio ajeno es la aplicación del Artículo 297 o los relativos a la mala fe, hay que auscultar la naturaleza de ambas actuaciones. A pesar de que el Código Civil define poseedor de buena fe a quien ostente un título sobre una propiedad o a quien ignore los vicios de ese título, 31 L.P.R.A. Secs. 1146, 1424, 5271, esta definición no se ajusta al contexto de la accesión industrial. Más aún, no hay una definición expresa en el Código en cuanto a qué constituye la buena fe al edificar, plantar o sembrar en suelo ajeno. *Véase Laboy Roque*, 181 D.P.R. en la pág. 740.

Ahora bien, esta Curia sí ha delimitado el alcance de ambos conceptos en el contexto de la edificación en suelo ajeno. Así, pues, hemos concluido que el obrante de mala fe es aquél que edifica una estructura en un predio **sin autorización alguna del dueño** y a sabiendas de que el terreno no le pertenece, mientras que el edificante de buena fe construye bajo la creencia fundada de que el terreno es suyo o **mediante autorización del dueño**. *C.R.U.V. v. Román,* 100 D.P.R. 318, 322-324 (1971); *Sucesión Echegaray*, 87 D.P.R. en la pág. 829 ("Dicha gestión se realizó de buena fe pues los

---

el carácter de inmueble adhiriéndose a la propiedad de manera que no puede separarse de ella sin quebrantamiento o deterioro. La accesión no se limita a edificaciones de carácter sustancial y permanente tales como edificios, viviendas ... sino que se da también con respecto a mejoras .... Por lo tanto, aun las mejoras útiles que pueden ser retiradas sin menoscabo del inmueble pueden ser objeto de la accesión a elección del dueño del inmueble.

Bernier, *supra*, pág. 62.

dueños de la propiedad ... habían dado permiso para llevar a cabo dicho trabajo").[37]  Sobre este asunto, Scaevola llega a la misma conclusión:

> ¿qué se entenderá por obrar de buena o mala fe en quien edifica ... sobre terreno ajeno? ... Pensamos que el accesionante o accedente procederá de buena fe cuando se considere con derecho a edificar, plantar o sembrar en el terreno en que así lo efectúe, ya con apoyo en algún título, en alguna autorización mal interpretada, ... en la tolerancia del dueño o entre otras causas del mismo tenor.

Scaevola, *supra*, págs. 594-595.

Hay un tercer curso aplicable en casos de accesión continua industrial en bienes inmuebles.  Se trata del escenario que recoge el Artículo 300 del Código Civil: cuando tanto el edificante como el dueño del predio actúan de mala fe.  En tal circunstancia, "los derechos de uno y otro serán los mismos que tendrían si hubieren procedido ambos de buena fe".  31 L.P.R.A. Sec. 1167.  En dicho artículo se define la mala fe del dueño cuando "el hecho se hubiere ejecutado a su vista, ciencia o paciencia, sin oponerse".  *Id.*  El contexto que evoca este artículo es la neutralización o compensación de dos actuaciones de mala fe.  *Véase García v. García*, 70 D.P.R. 949, 956 (1950) (citando a Manresa, *Comentarios al Código Civil Español* 223, T. III (5ta ed. 1920), expusimos: "quien se deja engañar a sabiendas no puede querellarse como

---

[37] Si bien la buena fe se presume, 31 L.P.R.A. Sec. 1425, en *Lippitt v. Llanos*, 47 D.P.R. 269 (1934), resolvimos que cuando se edifica en solar ajeno se destruye esa presunción y hay que probar la buena fe.  De la jurisprudencia se desprende que, en casos como el de autos, se recupera la calificación de buena fe con la autorización del dueño del predio para realizar las mejoras.

hombre engañado" y "la mala fe del uno extingue y neutraliza, en justa reciprocidad, la del otro").

Visto el marco teórico que antecede, pasemos a examinar la controversia de autos dentro de éste.

**B**

Según narramos anteriormente, en la controversia ante nosotros PRFS realizó mejoras en los predios de la CCE. Del expediente surge que el recurrido llevó a cabo tales actos a sabiendas de que no ostentaba ningún título sobre dicho predio ni que la Junta de Directores de la CCE había avalado aún el contrato de transacción entre las partes. No obstante, de las determinaciones de hechos que hiciera el Tribunal de Primera Instancia se desprende que la gerencia de la corporación pública expresamente autorizó y avaló que PRFS realizara mejoras internas para adecuar el Edificio #15 a sus necesidades comerciales.

Conforme al marco teórico esbozado, la actuación de PRFS no debe catalogarse de mala fe, puesto que la CCE autorizó a realizar dichas mejoras. Ergo, para disponer de la controversia debemos dirigirnos directamente a la disposición del Artículo 297 del Código Civil, 31 L.P.R.A. Sec. 1164. *Véase Berrocal*, 76 D.P.R. en la pág. 51 (si la edificación fue hecha con autorización expresa o implícita del dueño, se aplica el Artículo 297 del Código Civil, sobre la accesión). Aunque estamos convencidos sobre la aplicación directa del Artículo 297 del Código, si se aplicara el Artículo 300, 31 L.P.R.A. Sec. 1167, bajo la teoría de que PRFS actuó de mala

fe, como quiera llegaríamos a la misma conclusión; a saber, se aplicaría el Artículo 297 por cuanto la CCE actuó de mala fe al no oponerse ante las obras que realizó la recurrida.

Obsérvese que en *García v. García*, 70 D.P.R. 949 (1950), aplicamos el Artículo 300 del Código Civil aun cuando el dueño del predio **consintió expresamente** a que los edificantes hicieran "mejoras sustanciales" sobre dos estructuras existentes. *Id.* pág. 951.[38] No obstante, ahora preferimos adoptar la tendencia de la casuística posterior a los efectos de que la autorización expresa o actuación proactiva del dueño del predio releva la aplicación del Artículo 300 y dirige la controversia directamente a la aplicación del Artículo 297. Aunque un tanto textualista, acogemos la postura de dejar la aplicación del Artículo 300 a aquellas instancias en que el dueño del predio asume un rol pasivo de no oponerse a las obras realizadas.

Esa postura comulga el propósito del Artículo 300 del Código Civil con la expresión heredada de la Séptima Partida, Título XXXIV, Ley 25, que formula la actitud **pasiva** de: "quien se deja engañar entendiéndolo, no se puede querellar como hombre engañado". Scaevola, *supra*, págs. 592-593. Scaevola igual mostraría su conformidad con nuestra postura, por cuanto él entiende que "[e]l poseedor del predio, en realidad, **no muestra su mala fe más que con manifestaciones**

---

[38] *García v. García*, 70 D.P.R. 949 (1950), fue revocado por *Echegaray v. Tribunal de Distrito*, 72 D.P.R. 445 (1951), pero **sólo** a los efectos de que para ejercitar el derecho de accesión ya no hay que indemnizar el edificante previo a la demanda ni consignar junto con ésta cantidad alguna por los costos de edificación. *Echegaray*, 72 D.P.R. en la pág. 449.

**pasivas de su voluntad**; él deja hacer, ve venir y no impide, hace la *vista gorda*". *Id.* pág. 594.[39] En vista de lo anterior, no vacilamos en abandonar aquellas expresiones de *García v. García* y aplicar a la controversia de autos directamente el Artículo 297, debido a que la CCE fue proactiva en avalar y autorizar las mejoras hechas por PRFS.

Llegado a este punto, conviene recapitular que el Artículo 297 concede a la CCE una de entre dos alternativas: (1) puede hacer suya la obra, previa la indemnización debida a PRFS; o (2) de no ejercitar ese derecho, puede obligar a PRFS a pagar el precio del terreno.

De ejercer el derecho de accesión y hacer suya la edificación hecha por PRFS, la corporación pública deberá abonar al accedente sólo los gastos necesarios y útiles, conforme el Artículo 382 del Código Civil. 31 L.P.R.A. Sec. 1468; *véase Collazo Vázquez v. Huertas Infante*, 171 D.P.R. 84, 121-122 (2007) (Fiol Matta, J., Op. Concurrente); Vélez Torres, *Curso de Derecho Civil*, *supra*, págs. 102-103 (la aplicación de los Artículos 382 y 383 del Código Civil, 31 L.P.R.A. Secs. 1468 & 1469, que se sitúa en el primer párrafo del Artículo 297, aplica por igual al segundo párrafo de este último Artículo). Entiéndase **gastos necesarios** como los indispensables para la conservación de la cosa y los **útiles** como aquéllos que aumentan la capacidad de rendimiento y

---

[39] Al referirse al Artículo 364 del Código Civil español, equivalente al Artículo 300 del nuestro, Alberto Brenes Córdoba argumenta que la mala fe del dueño del predio debe entenderse como una **autorización tácita** o maliciosa complacencia para aprovecharse de lo ajeno. Alberto Brenes Córdoba, *Tratado de los bienes* 214 (5ta ed. 1981).

valor de la cosa, sin que tengan el propósito de servir como ornato o embellecimiento. José Castán Tobeñas, *Derecho Civil español, común y foral* 621-622, T. I (7ma ed. 1949).

Por último, mientras la CCE no ejerza su derecho de opción por una de las dos alternativas que le confiere el Artículo 297 del Código, PRFS poseerá un derecho propietario sobre la edificación realizada, que constituye un derecho real. *Berrocal v. Tribunal de Distrito*, 76 D.P.R. 38, 60-61 (1954).

## IV

De acuerdo a todo lo discutido, la conclusión no puede ser otra que la no aplicación de la doctrina de culpa *in contrahendo*, sino el articulado pertinente del Código Civil. Mediante la aplicación de este último la relación contractual entre las partes se extingue y desaparece.

En cuanto a las mejoras del interior del Edificio #15 hechas por PRFS, ésta tiene un derecho real sobre dichas obras al amparo del Artículo 297 del Código Civil. Por consiguiente, la CCE deberá ejercer su derecho de accesión e indemnizar a PRFS por el costo de los materiales o el costo de reproducción al momento de que la CCE ejercite su derecho de accesión, lo que resulte mayor, salvo que decida obligar a PRFS a pagar el precio del terreno.

Debido a que la determinación de hechos del foro de instancia sobre los gastos incurridos por PRFS ascendientes a $218,481 incluyen no sólo mejoras al interior del edificio,

sino costos de adiestramiento a empleados y otros, procedería devolver el caso al Tribunal de Primera Instancia para que desglose los gastos de la recurrida entre los que constituyen obras de mejoras y los que no. Así, lo que se determine exclusivamente como gastos de mejoras al interior del Edificio #15 será la cuantía que eventualmente la CCE deberá indemnizar a PRFS en caso de ejercer su derecho de accesión.

Finalmente, disiento porque la conclusión jurídica y la disposición final a la que llega una mayoría de esta Curia se apartan diametralmente de lo analizado y esbozado en esta Opinión y no añaden claridad doctrinal a nuestro Estado de Derecho Civil. Por todos los motivos que anteceden, revocaría al Tribunal de Apelaciones y devolvería la controversia al Tribunal de Primera Instancia para que proceda conforme a lo aquí expuesto.

Anabelle Rodríguez Rodríguez
Juez                    Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Puerto Rico Freight System,
Inc., representada por su
Presidente, Miguel Padilla
      Recurrido
            v.

Corporación para el Desarrollo          CC-2011-0278     Certiorari
de las Exportaciones de Puerto
Rico, t/c/c Promoexport,
representada por su Director
Ejecutivo, Antonio Sosa Pascual;
John Doe #1 y John Doe #2
      Peticionarios

Opinión Disidente emitida por el Juez Asociado SEÑOR ESTRELLA
MARTÍNEZ

San Juan, Puerto Rico, a 22 de octubre de 2012.

Hoy este Tribunal ha optado por una interpretación restrictiva de la extensión de la compensación del interés negativo en los casos de culpa *in contrahendo*. Respetuosamente disiento de este proceder. Por considerar que el principio de la buena fe en las negociaciones precontractuales merece una protección íntegra, incluiría en la indemnización por culpa *in contrahendo* el daño emergente, así como el lucro cesante resultante de las pérdidas de otras oportunidades de contratar.

I

En nuestro ordenamiento es reconocido que las negociaciones preliminares generan una

relación de carácter social que impone a las partes el deber de comportarse de acuerdo con la buena fe. Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 527 (1982). El principio de buena fe en las negociaciones es definido como "el deber en comportarse de forma leal y cooperadora frente al otro sujeto de derecho con el que nos relacionamos, de forma que con nuestro comportamiento puedan realizarse las expectativas comunes que mutuamente nos hemos trazado". M. J. Godreau, Lealtad y buena fe, 58 Rev. Jur. U.P.R. 367, 382 (1989). Es por esto que la buena fe crea un deber de lealtad recíproca de conducta socialmente valorable y exigible. Prods. Tommy Muñiz v. COPAN, supra, pág. 528.

Bajo este fundamento, en Prods. Tommy Muñiz v. COPAN, supra, reconocimos que la terminación injustificada de los tratos preliminares genera responsabilidad. Determinamos en el mencionado caso que la amplia gama de supuestos sobre los cuales puede basarse la responsabilidad precontractual hace necesario que en el análisis del problema se considere qué figura jurídica responde más adecuadamente como fundamento jurídico para la solución del caso.

En cuanto a la extensión de la indemnización, en Prods. Tommy Muñiz v. COPAN, supra, el entonces Juez Asociado señor Dávila realizó un voto separado en el cual consideró conveniente expresarse en cuanto a los daños que debían ser resarcibles en estos casos. Señaló que el daño al interés negativo debía ser reparable, el

cual a su juicio comprendía no sólo los gastos realizados en previsión del futuro contrato, sino también, las pérdidas ocasionadas por desaprovechar ocasiones favorables de celebrar un contrato con otras personas. Véase Prods. Tommy Muñiz v. COPAN, *supra*, Voto separado del Juez Asociado señor Dávila.

Posteriormente, en Colón v. Glamorous Nails, 167 D.P.R. 33 (2006), tuvimos ocasión para expresarnos acerca de la extensión de la indemnización que procedía en los casos de culpa *in contrahendo*. Al respecto, resolvimos que "el deber de indemnizar por el rompimiento culposo de los tratos preliminares alcanza, **de ordinario**, tan sólo el interés negativo; es decir, la reparación de los gastos sufridos y las pérdidas patrimoniales derivadas del proceder arbitrario de la parte que incurre en culpa". (Énfasis suplido.) Colón v. Glamorous Nails, *supra*, pág. 58. Es decir, determinamos que la indemnización en estos casos se limita al interés negativo. A su vez, expresamos que los componentes del interés negativo son los gastos sufridos y las pérdidas patrimoniales derivadas del proceder arbitrario.

Los fundamentos que fueron tomados en consideración para limitar el alcance de este tipo de indemnización principalmente fueron dos. El primero fue que la doctrina de culpa *in contrahendo* es considerada hija de la equidad y busca colocar al perjudicado como si no hubiesen ocurrido las circunstancias que dan lugar a la reparación. El segundo, la fuerte política pública a

favor del tráfico jurídico y la libertad de contratación. Íd., págs. 56-58.

Aunque atendimos en parte la extensión que debía tener la reparación en los casos de culpa *in contrahendo* y determinamos que el interés negativo se compone de los gastos sufridos y las pérdidas patrimoniales derivadas del proceder arbitrario, no nos expresamos en cuanto a qué gastos y pérdidas debían incluirse dentro del llamado interés negativo. Este Tribunal solamente estableció la improcedencia de la indemnización por daños morales en estos casos.

## II

Una vez más este Tribunal es llamado a expresarse en torno a la extensión de la indemnización de quien se vio afectado por la actuación de la otra parte al ésta concluir de manera injustificada los tratos preliminares e incumplir sus deberes de lealtad y buena fe en el proceso de negociación. En específico, este Tribunal debe determinar si el lucro cesante debe resarcirse dentro del daño al interés negativo.

Como señala la Opinión mayoritaria, la doctrina está un tanto dividida en cuanto a la extensión de lo que es compensable en los casos de culpa *in contrahendo*. Esto, debido a que el definir qué incluye el interés negativo ha sido motivo de debates. Pasemos a ver las diferentes definiciones y posturas.

La creación de la doctrina de culpa *in contrahendo* le es atribuida al jurista alemán Rudolf Von Ihering,

quien  en el 1860 publicó una monografía atendiendo el tema de la responsabilidad civil que se origina en el periodo de la formación del consentimiento. Véase, M.P. García Rubio, La responsabilidad precontractual en el Derecho español, España, Ed. Tecnos, S.A., 1991, pág. 27. Al abordar el tema de la extensión del resarcimiento en estas situaciones, Ihering elaboró la distinción entre el interés positivo y el interés negativo. El positivo tendría su fundamento en la validez del contrato, mientras que el negativo en su invalidez. García Rubio, op. cit., pág. 230. Según la teoría del interés negativo de Ihering, es este daño el que debe ser resarcido en los casos de culpa *in contrahendo*, el cual incluye, tanto los gastos realizados con miras a la conclusión del contrato, como los daños derivados del rechazo de la pérdida de otros contratos posibles. Íd.

La doctrina moderna ha ido redefiniendo estos conceptos. García Rubio, op. cit., pág. 231. Por ejemplo, el interés negativo ha sido definido como el daño que no se habría producido si el contrato se hubiese realizado. A. von Thur y E. Thilo, citado en García Rubio, op. cit., págs. 231-232. Así, el daño negativo comprende aquel daño que la parte experimentó por haber confiado honestamente en el proceso de negociación y la concreción del contrato. El interés positivo, en cambio, comprende todas las ventajas patrimoniales resultantes si el contrato se hubiere celebrado. M. Alonso Pérez, La responsabilidad

Precontractual, 47 Rev. Crítica de Derecho Inmobiliario 859, 905, Núm. 485 (julio - agosto 1971).

Según Mosset Iturrespe, el interés negativo, también llamado interés de confianza, consiste en el daño sufrido como consecuencia de haber creído en la conclusión del contrato; la pérdida sufrida por haber atendido una invitación a entrar en tratativas o una oferta. J. Mosset Iturraspe, Responsabilidad por daños, Buenos Aires, Ed. Ediar, 1982, pág. 159. "El resarcimiento tiende a restablecer el statu quo anterior a esos hechos". Íd. Por esta razón, el mencionado autor se adhiere sin reservas a la postura que extiende el interés negativo que debe ser resarcible para abarcar las ganancias que pudieron obtener en un negocio dejado de lado. De esta forma, Mosset Iturraspe favorece la inclusión del lucro cesante, criterio que indica es predominante en la doctrina europea. Íd.

Por su parte, Alonso Pérez expresa que el interés negativo comprende los gastos que se realizaron en previsión del futuro contrato, tales como viajes, informes periciales y asesoramientos. Alonso Pérez, op. cit., pág. 905. Pero también comprende las pérdidas ocasionadas por no aprovechar ocasiones favorables de celebrar un contrato con otras personas. Íd. "[E]s preciso que se ocasione un perjuicio patrimonial, representado por los gastos realizados en atención al contrato proyectado o por las pérdidas sufridas en cuanto que la actitud dolosa de la parte impidió a la

otra, confiada en su honorabilidad, celebrar el negocio con otros proponentes". Alonso Pérez, op. cit., pág. 906.

De forma similar, García Rubio considera que el lucro cesante indemnizable comprende la pérdida de otras oportunidades de contratar con un tercero, así como las ventajas que ellas derivarían, lo que exige demostrar la existencia efectiva de esas otras oportunidades negociables. García Rubio, op. cit., pág. 233.

La doctrina italiana sigue la doctrina de Ihering en cuanto a la distinción entre el interés negativo y positivo. Limita la indemnización al interés negativo por el daño ocasionado como consecuencia de haber confiado en las negociaciones precontractuales con independencia del nacimiento del acuerdo jurídico. J. Mendieta, La culpa *in contrahendo* Historia, Evolución y Estado Actual de la Cuestión, 10 Rev. E-Mercatoria 40, 49, (Núm. 2). Disponible en http://www.emercatoria.edu.co. La corte italiana ha establecido que el daño resarcible comprende la pérdida derivada de la confianza en la conclusión del contrato y la pérdida de ganancias a consecuencia del quebranto de otras ocasiones contractuales. Íd.; Alonso Pérez, op. cit., pág. 905.

Otra parte de la doctrina tiene una visión aún más amplia y define al daño negativo como aquel que está compuesto por todos los daños sufridos por el acreedor, a causa de haber confiado en la vigencia de un contrato

que no se concretó. Quienes siguen esta postura entienden que éste comprende todos los daños en relación de causalidad adecuada, que ocasiona la frustración del acto en sentido amplio. Véase, L. Cantarelli, Daño al interés negativo, Las tesinas de Belgrano, núm. 152, pág. 20, (2004). Disponible en http://www.ub.edu.ar/.

En Puerto Rico, el profesor José Julián Álvarez González ha expresado su inclinación a favorecer la postura de Alonso Pérez, en cuanto a la inclusión de otras pérdidas causadas por desaprovechar ocasiones favorables de celebrar un contrato con otras personas. Véase: J. J. Álvarez González, El Tribunal Supremo de Puerto Rico: Análisis del Término 2005-2006, Responsabilidad Civil Extracontractual, 76 Rev. Jur. U.P.R. 763, 786 (2007). Igual postura parece sostener el profesor Michael Godreau, al señalar que no logra ver la justificación para no proteger de una forma igualmente vigorosa a la víctima del comportamiento negligente que a un negociante de buena fe, víctima del quebrantamiento de sus expectativas razonables de contratar. M. J. Godreau, El Tribunal Supremo de Puerto Rico: Análisis del Término 2005-2006, Obligaciones y Contratos, 76 Rev. Jur. U.P.R. 901, 902-903 (2007).

En contraposición a las posturas que admiten el doble componente de la indemnización en la ruptura de las negociaciones y las posturas aún más abarcadoras, se encuentran quienes rechazan la inclusión del lucro cesante en la indemnización por la ruptura de las

negociaciones contraria a la buena fe. Según estos autores, cuando ocurre un retiro de las negociaciones puede indemnizarse solamente por los gastos realizados, no así por las ganancias dejadas de percibir.

Uno de los primeros en plantear esta visión lo fue G. Faggella. El jurista italiano rechazó el concepto de interés negativo. G. Faggella, *Dei periodi precontracttuali e della loro vera ed esatta costruzione scientifica*, 1906, t. III, pág. 341, citado en M. P. García Rubio, op. cit. pág. 32. En su lugar propuso que el daño resarcible se compone del valor de la oferta con relación a la formación del contrato y por los daños y gastos que hubiese incurrido durante los tratos. Íd. En estos gastos no incluye la reparación de las ocasiones perdidas. Íd. De manera similar, Moreno Quesada considera que sólo deben ser indemnizables los gastos llevados a cabo en miras de la concreción del contrato. B. Moreno Quesada, La oferta de contrato: génesis del contrato y responsabilidad antecontractual, Barcelona, Ed. Nereo, 1963, pág. 56.

Entre quienes defendían la no inclusión del lucro cesante en la cuantía de indemnización por culpa *in contrahendo* se encontraba Díez Picazo. Sin embargo, este autor al parecer ha modificado su postura recientemente. Ha afirmado que el interés negativo comprende también el lucro cesante o la ventaja que la parte perjudicada hubiera podido obtener si como consecuencia de la negociación emprendida, hubiera perdido otra ocasión de

contratar. Véase, L. Díez-Picazo, <u>La existencia del contrato</u>, AAMN, núm. 39., pág. 190 (2009), citado en M. P. García Rubio, Estudio Doctrinal: <u>La responsabilidad precontractual en la propuesta de modernización del derecho de obligaciones y contratos</u>. LXV Boletín del Ministerio de Justicia Núm. 2130 (2011). Disponible en <u>www.mjusticia.es/bmj</u>.

Como vemos, la postura de no inclusión del lucro cesante o la ventaja de oportunidades de contratar con terceros al parecer es minoritaria.[40] Según García Rubio, esta división en cuanto a computar como elementos del interés negativo, tanto los gastos inútilmente realizados como la frustración de ganancias futuras no es marcada en la doctrina extranjera, por lo cual le sorprende que algunos autores en la doctrina española excluyan como partida del interés negativo la falta de ganancia. García Rubio, op. cit, pág. 232.

III

La mayoría de este Tribunal ha optado por la interpretación acotada de la extensión de los daños al interés negativo. Con esta determinación, se limita la protección que debe perseguir el principio de buena fe durante las negociaciones. Considero que una interpretación estricta y estrecha no logra el objetivo de proteger el principio de la buena fe. Tal como expresamos en <u>Colón v. Glamorous Nails</u>, *supra*, pág. 45, a lo que debemos aspirar es a conseguir que el

---

[40]Véanse, J. Mosset Iturraspe, op. cit., pág. 159; García Rubio, op. cit, pág. 232.

desarrollo de las relaciones jurídicas, el ejercicio de los derechos y el cumplimiento de las obligaciones se produzcan conforme a una serie de principios que la conciencia jurídica considera necesario.

En materia de indemnización, el Art. 1059 de nuestro Código Civil, 31 L.P.R.A. sec. 3023, establece que la indemnización de daños y perjuicios comprende no sólo el valor de la pérdida que haya sufrido, sino también el de la ganancia dejada de obtener. Este artículo es aplicable, tanto a relaciones extracontractuales, como a las contractuales. Claramente, el mencionado articulado reconoce que la indemnización comprende el daño emergente y el lucro cesante.

Como mencionamos, la responsabilidad que surge por la culpa *in contrahendo* no comprende todos los daños contractuales sufridos por la otra parte, sino sólo los perjuicios englobados en el llamado interés negativo. Colón v. Glamorous Nails, *supra*; Alonso Pérez, op. cit., pág. 905. La naturaleza reparativa está basada en el principio de que quien vulnera la confianza depositada por otro debe devolver a esa persona al estado que hubiera estado si no se hubieran dado las circunstancias que dan lugar a la reparación. Colón v. Glamorous Nails, *supra*, pág. 57.

Los dos fundamentos principales para delimitar la indemnización en los casos de culpa *in contrahendo* son que ésta proviene de la equidad, cuyo propósito es

sancionar el quebrantamiento de la confianza, y que se busca proteger la libertad de contratación. Estos principios fueron claves para decidir circunscribir la compensación solamente al llamado interés negativo. Pero, debemos preguntarnos si estas razones son suficientes para no reconocer en la extensión del interés negativo una cuantía por lucro cesante, ocasionado por las pérdidas patrimoniales consecuentes del quebranto de otras ocasiones de contratar que la parte perjudicada hubiera podido obtener.

La equidad exige que la buena fe sea protegida frente a la conducta culpable que puede causar una consecuencia dañosa. Véase, Moreno Quesada, op. cit., pág. 200. En Colón v. Glamorous Nails, *supra*, expresamos que como hija de la equidad, la doctrina de culpa *in contrahendo* persigue sancionar el quebrantamiento de la confianza y regresar a las partes a la situación en la que se encontraban antes de comenzar los tratos fallidos. Quien sufrió un daño a su patrimonio como consecuencia de una violación al principio de la buena fe contractual de quien incurrió en culpa *in contrahendo* debe tener una protección completa. Existen unos efectos patrimoniales que no están circunscritos a un desembolso de efectivo. Por esta razón, para cumplir con el principio de equidad y sancionar ese quebrantamiento de la confianza, no basta con indemnizar solamente los gastos incurridos. También debe resarcirse el lucro cesante. De esta manera, la indemnización debe

extenderse a las oportunidades perdidas como consecuencia de las expectativas creadas. De igual forma, deben resarcirse las pérdidas ocasionadas por situaciones en las que se llegan a ciertas negociaciones y ofertas que no pueden concretarse debido al retiro injustificado de las negociaciones de la otra parte.

El no reparar las pérdidas patrimoniales surgidas por el quebrantamiento de la buena fe en los tratos preliminares convierte la indemnización en una incompleta, cuya consecuencia real es no colocar al perjudicado en la situación anterior. Para lograr el mencionado propósito de la equidad, sancionar el quebrantamiento de la confianza, es imperativo conceder una indemnización íntegra al perjudicado.

El otro fundamento para el alcance limitado de la indemnización en estos casos es el principio de no coartar la libertad de contratación ni el tráfico jurídico. Sin embargo, el propio reconocimiento de la responsabilidad por culpa *in contrahendo* delimita el principio mencionado. Es sabido que la libertad de romper las negociaciones no es absoluta. Precisamente, el límite reside en la confianza depositada por la otra parte en la conclusión del contrato y el principio de la buena fe durante las negociaciones. Aunque nadie está obligado a contratar en esta etapa, sí existe una obligación de comportarse según los principios de buena fe y la violación a éstos conlleva el tener que reparar el daño causado. El incluir el lucro cesante en la

cuantía a poder ser indemnizada en los casos de culpa *in contrahendo* no elimina la libertad de contratación. Por el contrario, reitera la obligación de las partes de comportarse según los principios de buena fe.

Como vemos, los fundamentos mencionados no son suficientes para no reconocer una reparación real e íntegra a quien, confiando en la concreción del contrato, debido a las expectativas creadas por la otra parte, incurre en una serie de gastos y pérdidas patrimoniales.

Además de estos dos fundamentos principales mencionados en nuestra jurisprudencia, otra de las razones utilizadas para sustentar la teoría de no inclusión del lucro cesante en la indemnización por culpa *in contrahendo* lo es la dificultad probatoria que representa la determinación del lucro cesante. La Opinión mayoritaria menciona que la partida de lucro cesante resulta improcedente cuando ésta es especulativa o no se puede demostrar su correlación con el acto dañoso. Sin embargo, cuando mediante prueba es demostrada la pérdida patrimonial ocasionada por el retiro injustificado de las negociaciones, la partida no es especulativa y mucho menos improcedente.

Es sabida la dificultad que encierra la determinación de la cuantía de lucro cesante. Y es que, de ordinario, cuando el daño consiste en una disminución de patrimonio, la prueba de certeza no suele ser complicada. J. Mendieta, *supra*, pág. 52. Sin embargo,

cuando se quiere demostrar la pérdida de un ingreso futuro, la prueba del daño resulta más compleja. Íd. Es por esto que la determinación de la cuantía de lucro cesante es descrita como una operación intelectual, en la que se contienen juicios de valor y que de ordinario, exige la reconstrucción hipotética de lo que podría haber ocurrido. L. Díez Picazo, Derecho de Daños, Madrid, Civistas Ediciones, S.L., 1999, pág. 323. Sin embargo, el que existan dificultades probatorias para demostrar su existencia real no debe ser óbice para limitar la extensión de la indemnización que debe reconocerse en casos de culpa in contrahendo, esto debido a que la dificultad probatoria es común a la prueba de todos los lucros cesantes. García Rubio, op. cit. Estudio Doctrinal: La responsabilidad precontractual en la propuesta de modernización del derecho de obligaciones y contratos. LXV Boletín del Ministerio de Justicia Núm. 2130 (2011). Disponible en www.mjusticia.es/bmj.

Alonso Pérez reconoce la complejidad que en ocasiones puede resultar la determinación de la extensión objetiva del resarcimiento. Sin embargo, señala que debe determinarse la indemnización de acuerdo a "las circunstancias delimitantes de cada supuesto concreto, el tipo de negocio que se preparaba y los gastos reales desembolsados". M. Alonso Pérez, op. cit., pág. 906. La dificultad probatoria de manera alguna justifica que tales lucros deban ser excluidos como

partida a resarcir. Así, el quebranto patrimonial sufrido por el perjudicado debe ser resarcido brindando la indemnización tanto del daño emergente, como del lucro cesante comprendido por las pérdidas de otras oportunidades de contratar que se ven frustradas.

La dificultad en la determinación del lucro cesante reside en que sólo debe incluirse en este concepto los beneficios ciertos, concretos y acreditados que el perjudicado debía haber percibido y no ha sido así. P.J. Femenía López, Criterios de delimitación del lucro cesante extracontractual, Valencia, Ed. Tirant Lo Blanch, 2010, pág. 40. Es por esto que solamente podrán ser compensados los daños patrimoniales que dependan del mismo hecho y que sean un efecto de éstos. Al cumplir con este principio, el daño no es especulativo.

El límite en la cuantía a ser indemnizada por la que debe responder la persona que se retiró de las negociaciones y violentó así el deber de culpa *in contrahendo* debería ser determinado de acuerdo a la relación de causalidad. García Rubio, op. cit., pág. 241. "La delimitación de lo que debe incluir el interés negativo no debe ser absoluta, sino más bien relativa. Le corresponde al demandante probar la extensión de su daño y la certeza de éste, así como la relación de causalidad entre el hecho dañino y sus daños". J. Mendieta, op. cit., pág. 70. De esta manera, para poder repararse debe ser probada una relación de causalidad entre el daño y la actuación culposa o negligente.

La Opinión mayoritaria señala que quien usa un derecho a nadie ofende. Opinión mayoritaria, págs. 33-34. Sin embargo, tal como expusimos en Colón v. Glamorous Nails, *supra*, reconocimos que el ejercicio de un derecho no está exento de responsabilidad si se ejercita de forma abusiva. Es por esto que cuando se incurre en culpa *in contrahendo* existe una responsabilidad. No es correcto expresar que en la etapa precontractual no existe ningún género de responsabilidad. La responsabilidad de comportarse conforme a los principios de buena fe y lealtad fue reconocida desde el caso de Prods. Tommy Muñiz v. COPAN, *supra*, según discutimos.

Por otra parte, el que la norma de culpa *in contrahendo* sea aplicada restrictivamente no es sinónimo de que la indemnización que sea reconocida una vez aplicada la culpa *in contrahendo* a unos hechos en particular deba restringirse a un tipo de indemnización. La determinación del resarcimiento debe alcanzar el interés negativo como hemos resuelto, el cual comprende tanto el daño emergente como el lucro cesante, siempre sujeto al elemento de causalidad y a la prueba presentada.

Si reconocemos, como lo hemos hecho en el pasado, que en el curso de las negociaciones existe un deber de lealtad, al éste ser incumplido debe resarcirse al demandante. Sin embargo, es importante aclarar que la postura que reconoce el doble componente en esta

indemnización no iguala la indemnización obtenida de la celebración y posterior cumplimiento del contrato. No se trata de equipararlo a los casos de incumplimiento propiamente contractual, sino de establecer la norma y ver caso a caso que se cumplan, como mencionamos, los criterios de causalidad adecuada.

IV

A.

Al determinar la extensión de la indemnización del interés negativo no debemos limitarnos a atender los gastos incurridos en miras al cumplimiento del contrato que se estaba negociando. Luego de haberse creado unas expectativas, podrían existir unas pérdidas patrimoniales que no están comprendidas en un gasto incurrido. Por esta razón, es importante no limitar la indemnización a los gastos incurridos en miras al contrato que se esperaba realizar. En cambio, debería poderse incluir en la indemnización las pérdidas de otras oportunidades de contratar con terceros.

En cuanto a esta indemnización, García Rubio sostiene que el negociador, a quien le fue ofrecida otra oportunidad de contratar, puede efectivamente romper las negociaciones, pero puede también no hacerlo y, si opta por esto último, no ve razón por qué tiene que sufrir las consecuencias negativas de la ilegítima actuación de su conegociante. García Rubio, op. cit., pág. 235. Es por esto que no lo ve como un riesgo de negocios que debe asumir. Íd.

En la etapa de negociación pueden considerarse varios factores para que un negociante pierda ofertas más favorables. Los criterios que son tomados en consideración para determinar si ha mediado culpa en la terminación de los tratos preliminares sirven de norte para comprender las razones por las que una persona pueda optar por continuar en las negociaciones, aunque así pierda otras oportunidades de contratar. El desarrollo de las negociaciones, los hechos particulares y la relación que se ha venido dando, el curso que siguieron las mismas, la conducta de las partes en su transcurso, la etapa avanzada de las negociaciones, los gastos ya incurridos en vista del contrato que se esperaba realizar, la expectativa razonable de la conclusión del contrato, son consideraciones que demuestran las razones por las cuales una parte puede optar por mantenerse en las negociaciones y afectar así las oportunidades que tenga con otros. García Rubio también señala que puede querer continuar debido a la confianza especial que suscita. García Rubio, op. cit., pág. 241. Si el negocio proyectado no llega a celebrarse, "la persona defraudada sufre un daño que será tanto mayor mientras mayor sean las condiciones en las que pueda celebrar un contrato semejante al frustrado". Íd.

De igual forma, existen situaciones en las que una parte realiza ciertas negociaciones con miras a la concreción del contrato que estaba negociándose, pero la

otra parte quebranta estos procesos afectando así la buena fe y lealtad depositada por el otro. El daño ocasionado por las negociaciones que se ven frustradas debido a la no realización del contrato que se estaba negociando debería ser indemnizado. Son situaciones que no están comprendidas en los gastos incurridos propiamente, pero que crean una pérdida patrimonial que debería ser atendida a tenor con la protección de la buena fe en los tratos preliminares.

En síntesis, la reparación en casos de culpa *in contrahendo* debe poder comprender tanto los gastos inútiles efectuados durante las negociaciones, como también la pérdida de ocasiones de negociar a causa del contrato no concluido. Por lo tanto, la reparación comprendería tanto el daño emergente como también, de haberlo, el lucro cesante.

Por los fundamentos expresados y por entender que la interpretación limitada en cuanto a la indemnización en casos de culpa *in contrahendo* por la que ha optado la opinión mayoritaria va en detrimento del principio reconocido y la protección a éste, disiento de la decisión de la mayoría.

B.

En el caso ante nuestra consideración, surge del expediente que fue presentada prueba testifical y documental que demostró que los recurridos incurrieron en gastos como consecuencia de la expectativa que tenían respecto al contrato de arrendamiento. Para establecer estos daños, los recurridos presentaron un informe de daños y un estimado de pérdidas realizadas por un perito. Apéndice, pág. 2110. En este informe fue incluida la cantidad de gastos incurridos con miras al contrato que iba a realizarse. Entre los gastos incurridos se demostraron gastos en contratación de arquitectos, preparación de un manual, compra de programas de computadoras y gastos de adiestramientos y viajes para los mismos, entre otros. De igual forma, fueron establecidas las pérdidas de otras ocasiones de contratar. En vista del contrato que se realizaría, los recurridos llevaron a cabo negociaciones para otros contratos. Esto debido a que tenían un plan de ampliación. Estas negociaciones fueron con miras a la concreción del contrato que estaba negociándose para el arrendamiento del edificio 15, pero no pudieron concretarse como consecuencia de la no realización del contrato esperado. De esta manera, la otra parte quebrantó estos procesos y se afectó la buena fe y lealtad depositada por Puerto Rico Freight System (PRFS).

En el informe, el perito utilizó dos clientes existentes para realizar los cómputos de la expectativa de ganancia. Apéndice, pág. 1764. El recurrido presentó suficiente prueba documental, testifical y pericial que convenció a los foros de su procedencia. Como vemos, la prueba del recurrido sobre los costos y gastos incurridos resultó convincente.

Como es sabido, la apreciación de la prueba del foro primario merece gran deferencia. En ausencia de pasión, prejuicio, error manifiesto o parcialidad los foros apelativos no deben intervenir con las determinaciones de hecho y la apreciación de la prueba que realiza un tribunal de instancia. Colón v. Lotería, 167 D.P.R. 625, 659 (2006); Lugo v. Municipio Guayama, 163 D.P.R. 208, 221 (2004); Argüello v. Argüello, 155 D.P.R. 62, 78-79 (2001).

V

Por todo lo antes expuesto, respetuosamente disiento del criterio mayoritario. En su lugar, reconocería la procedencia del lucro cesante dentro de la partida del interés negativo que procede ser compensado en los casos de culpa *in contrahendo*. Por consiguiente, confirmaría el dictamen del Tribunal de Apelaciones.

Luis F. Estrella Martínez
Juez Asociado